UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

TIMOTHY MAYO, et al.                    )
                                        )
    Plaintiffs,                      )
                                        )
    v.                               )
                                        )   Civ. No. 14-1751
JONATHAN B. JARVIS, et al.              )
                                        )
    Defendants,                      )
                                        )
STATE OF WYOMING,                       )
SAFARI CLUB INTERNATIONAL,              )
                                        )
    Intervenor-Defendants            )
_____ )

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs hereby move for summary judgment on the grounds that there are no disputed

issues of material fact in this case in which the merits must be resolved on the basis of the

administrative record filed by Federal Defendants, and Plaintiffs are entitled to judgment as a

matter of law that Defendants' actions are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," and "without observance of procedure required by law,"

within the meaning of the judicial review provisions of the Administrative Procedure Act, 5

U.S.C. § 706(2).  In support of this motion, Plaintiffs are filing the accompanying memorandum,

which includes a Statement of Facts with references to the administrative record in compliance

with Local Rule 7(h)(2), Exhibits A-C, and a Proposed Order.

Respectfully submitted,

/s/Eric R. Glitzenstein
Eric R. Glitzenstein
D.C. Bar No. 358287
Katherine A. Meyer
D.C. Bar No. 244301
Meyer Glitzenstein & Eubanks LLP
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206
eglitzenstein@meyerglitz.com

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

TIMOTHY MAYO, et al.                          )
                                              )
      Plaintiffs,                             )
                                              )
      v.                                      )
                                              )     Civ. No. 14-1751
JONATHAN B. JARVIS, et al.                    )
                                              )
      Defendants,                             )
                                              )
STATE OF WYOMING,                             )
SAFARI CLUB INTERNATIONAL,                    )
                                              )
      Intervenor-Defendants                   )
_____ )

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

/s/Eric R. Glitzenstein
Eric R. Glitzenstein
D.C. Bar No. 358287
Katherine A. Meyer
D.C. Bar No. 244301
Meyer Glitzenstein & Eubanks LLP
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206
eglitzenstein@meyerglitz.com

Counsel for Plaintiffs

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.      STATUTORY AND REGULATORY FRAMEWORK. . . . . . . . . . . . . . . . . . . . 2

          1.      The National Park Service Organic Act. . . . . . . . . . . . . . . . . . . . . . . 2

          2.      The Grand Teton National Park Act. . . . . . . . . . . . . . . . . . . . . . . . . . 3

          3.      The National Environmental Policy Act. . . . . . . . . . . . . . . . . . . . . . . 4

          4.      The Endangered Species Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.      STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          1.      Grand Teton and Management of the Elk Herd. . . . . . . . . . . . . . . . . 7

          2.      NPS's Annual Authorizations Of Elk Hunting In Grand Teton. . . . . . . . 12

          3.      The Agencies' ESA Section 7 Consultation Regarding Impacts
                Of The Elk Hunts On Threatened Grizzly Bears. . . . . . . . . . . . . . . . . . 19

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.      STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.     NPS'S AUTHORIZATION OF ELK HUNTING IN GRAND TETON IN 2015,
       AS IN PAST YEARS, VIOLATES NEPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    A.      When, As In 2015, NPS Makes New Decisions Regarding Whether,
            And On What Conditions, To Authorize Elk Hunting in Grand Teton,
            It Does So Without Complying With NEPA In Any Manner. . . . . . . . . . . . . . 22

    B.      NPS Has No Lawful Justification For Failing To Comply With NEPA
            When It Makes Decisions Regarding The Elk Hunts. . . . . . . . . . . . . . . . . . . . 30

III.    NPS AND FWS ARE IN VIOLATION OF THE ESA. . . . . . . . . . . . . . . . . . . . . . . . 35

IV.    AS WITH ITS PRIOR ANNUAL DECISIONS AUTHORIZING ELK
HUNTING, NP'S 2015 DECISION DOES NOT EXPLAIN WHY THE
HUNTING IS "NECESSARY FOR THE PURPOSE OF PROPER
MANAGEMENT AND PROTECTION OF THE ELK" WITHIN THE
MEANING OF 16 U.S.C. § 673c(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

V.    NPS'S 2015 DECISION, AS WITH ITS PRIOR DECISIONS AUTHORIZING
ANNUAL ELK HUNTS, DOES NOT COMPLY WITH NPS'S OBLIGATION
UNDER THE ORGANIC ACT TO MAKE DETERMINATIONS AS TO
WHETHER THE HUNTS IMPAIR PARK RESOURCES.. . . . . . . . . . . . . . . . . . . . . . 42

VI.    CONCLUSION AND PROPOSED REMEDY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Andrus v. Sierrra Club*,
   442 U.S. 347 (1979) ........................................................................... 31

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.*,
   515 U.S. 687 (1995) ........................................................................... 38

*Balt. Gas and Elec. Co. v. Natural Res. Def. Council*,
   462 U.S. 87 (1983) ..................................................................... 1, 4, 25

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................... 36

*Bluewater Network v. Salazar*,
   721 F. Supp. 2d 7 (D.D.C. 2010)........................................................ 44

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*,
   449 F.2d 1109 (D.C. Cir. 1971)........................................................... 31

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................... 21

*Defenders of Wildlife v. Salazar*,
   651 F.3d 112 (D.C. Cir. 2011).......................................... 8, 9, 10, 11, 34

*Defenders of Wildlife v. Salazar*,
   698 F. Supp. 2d 141 (D.D.C. 2010)..................................................... 11

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ....................................................................... 4, 23

*Ethyl Corp. v. EPA*,
   541 F.2d 1 (D.C. Cir. 1976).................................................... 21, 22, 43

*Fund for Animals v. Clark*,
   27 F. Supp. 2d 8 (D.D.C. 1998)................................... 10, 16, 31, 33, 39

*Fund for Animals v. Hall*,
   448 F. Supp. 2d 127 (D.D.C. 2006)..................................................... 27

*Fund for Animals v. Mainella*,
   283 F. Supp. 2d 418 (D. Mass. 2003)........................................................ 32

*Gerber v. Norton*,
   294 F.3d 173 (D.C. Cir. 2002)................................................................. 42

*Greater Yellowstone Coal. v. U.S. Dep't of the Interior*,
   577 F. Supp. 2d 183 (D.D.C. 2008)......................................................... 44

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Service*,
   No. 2:05-CV-0299, 2006 WL 1991414 (E.D. Cal. July 14, 2006)........... 34

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................. 21

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015 .............................................................................. 39

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................. 21, 36, 38, 39, 40, 41, 42

*Or. Envtl. Council v. Kunzman*,
   714 F.2d 901 (9th Cir. 1983)................................................................... 34

*Res. Ltd., Inc. v. Robertson*,
   35 F.3d 1300 (9th Cir. 1993)................................................................... 39

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ........................................................................... 5, 6, 7

*Sierra Club v. Mainella*,
   459 F. Supp. 2d 76 (D.D.C. 2006)........................................................... 44

*Sierra Club v. U.S. Dep't of Agric.*,
   777 F. Supp. 2d. 44 (D.D.C. 2011).......................................................... 23

*Sprint Nextel Corp. v. FCC*,
   508 F.3d 1129 (D.C. Cir. 2007)............................................................... 40

*Sw. Ctr. for Biological Diversity v. Babbitt*,
   215 F.3d 58 (D.C. Cir. 2000)................................................................... 38

*Tourus Records, Inc. v. DEA*,
   259 F.3d 731 (D.C. Cir. 2001)................................................................. 36

iv

*Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
   437 F.3d 75 (D.C. Cir. 2006) ............................................................................ 40

*TVA v. Hill*,
   437 U.S. 153 (1978) ......................................................................................... 38

*Williams Gas Processing-Gulf Coast Co. v. FERC*,
   475 F.3d 319 (D.C. Cir. 2006) .......................................................................... 40

## STATUTES

5 U.S.C. § 706(2) ..................................................................................................... 2, 44

16 U.S.C. § 1 ............................................................................................................ 2, 42

16 U.S.C. §§ 406d-1 *et seq.* .......................................................................................... 3

16 U.S.C. § 673 ............................................................................................................ 9

16 U.S.C. § 673c(a) ........................................................................... 2, 3, 13, 23, 39, 42

16 U.S.C § 673c(b) .......................................................................................... 4, 24, 29

16 U.S.C. §§ 1531 *et seq* ............................................................................................... 2

16 U.S.C. § 1531(b) ...................................................................................................... 6

16 U.S.C. § 1532(19) ................................................................................................ 6, 37

16 U.S.C. § 1536(a)(2) ............................................................................................. 7, 36

16 U.S.C § 1536(b)(4) ................................................................................................... 7

16 U.S.C. § 1536(b)(4)(C)(ii) ...................................................................................... 38

42 U.S.C. §§ 4321 *et seq* .......................................................................................... 1, 4

42 U.S.C. § 4332 ........................................................................................................... 5

## REGULATIONS

36 C.F.R. § 2.2(b)(2) .................................................................................................. 24

40 C.F.R. § 1500.1(a) ............................................................................................... 4

40 C.F.R. § 1500.1(b) ............................................................................................ 5, 6

40 C.F.R. §§ 1500.1(c) .............................................................................................. 5

40 C.F.R. § 1501.4 ..................................................................................................... 5

40 C.F.R. § 1502.9(c) .............................................................................................. 34

40 C.F.R. § 1508.4 ................................................................................................... 22

40 C.F.R. § 1508.18(a) ............................................................................................ 22

40 C.F.R. § 1508.27(b)(1) ....................................................................................... 30

50 C.F.R. § 17.3 .......................................................................................... 6, 21, 38

50 C.F.R. § 17.32 ....................................................................................................... 6

50 C.F.R. § 402.14 ..................................................................................................... 7

50 C.F.R. § 402.16 ..................................................................................................... 7

## INTRODUCTION

This action challenges annual decisions made by the National Park Service ("NPS") authorizing the recreational hunting of elk in Grand Teton National Park ("Grand Teton" or "the Park") as part of the Park's Elk Reduction Program ("ERP" or "elk hunt").   Grand Teton is one of the few national parks in the country where hunting of any kind is permitted, and NPS's decisions permitting recreational elk hunting have a host of adverse impacts on other visitors to Grand Teton (including Plaintiffs) who visit the Park for more tranquil pursuits such as photographing wildlife, hiking, and the peaceful contemplation of a unique place whose core purpose, as described by NPS itself, "is to protect the area's native plant and animal life, its cultural and historic resources, and its spectacular scenic values, as characterized by the geologic features of the Teton Range."   NPS Administrative Record ("AR") 1915.

Although NPS has for many years declared an objective of eliminating or at least drastically reducing the elk hunt – an anomaly in a national park system dedicated to the conservation of native wildlife – the hunt continues to be authorized through new agency decision documents year after year.   Remarkably, however, in approving the annual hunts – as it has done most recently in May of this year for the 2015 hunting season – NPS does not comply with *any* of the requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*. ("NEPA"), or that statute's implementing regulations, although NEPA requires federal agencies to take a "hard look" at the environmental impacts of, and alternatives to, their decisions.   *Balt. Gas and Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 100 (1983).

Although this violation of NEPA is the most blatant example of how the hunt decisions conflict with federal environmental law, it is not the only one.   NPS's annual authorizations of

the hunt, as well as the role the U.S. Fish and Wildlife Service ("FWS") plays in overseeing the hunt's impacts on endangered and threatened species, also contravene the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*. ("ESA").   The hunts not only put hunters in direct conflict with grizzly bears, a threatened species under the Act – resulting in a bear recently being killed by a hunter in the Park where protection of a federally listed threatened species should be paramount – but also have other adverse impacts on grizzly bears that have never been considered by NPS or FWS in the manner mandated by the ESA.   In addition, in 2015, as in past years, NPS's authorization of the hunt is not accompanied by any explanation by NPS as to why the killing of elk is in fact "necessary for the purpose of proper management and protection of the elk," as required by the legislation that established the Park, 16 U.S.C. § 673c(a).

For these and other reasons set forth below, Defendants' actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "without observance of procedure required by law," within the meaning of the judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

## BACKGROUND

### A.   STATUTORY AND REGULATORY FRAMEWORK

#### 1.   The National Park Service Organic Act

Congress created NPS in 1916 to "promote and regulate" the public use of our national parks "by such means and measures" as are necessary to conform to the "fundamental purpose" of the parks, which is to "conserve the scenery and the natural and historic objects and the wild life therein and *to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations*."   16 U.S.C. § 1 (the

2

"Organic Act") (emphasis added).    Pursuant to this requirement, NPS's official *Management Policies* provide that "NPS Managers must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values," and hence human activities may be permitted only "so long as the impact does not constitute impairment of the affected resources and values."    NPS, *Management Policies* § 1.4.3 (2006) (emphasis added) (excerpts attached as Pl. Ex. C).[1]    Accordingly, "[b]efore approving a proposed action that *could* lead to an impairment," either the action "must not be approved," or NPS "must consider the impacts of the proposed action and determine, *in writing*, that that the activity will not lead to an impairment of park resources and values."    *Id*. § 1.4.7 (emphasis added).

> ## 2.    The Grand Teton National Park Act

In 1950, Congress enacted legislation designating Grand Teton National Park in its present form as a unit of the National Park System.    16 U.S.C. §§ 406d-1 *et seq*. ("Grand Teton Act").    Congress provided that NPS "shall, so far as consistent with" the specific provision applicable to Grand Teton, administer the Park "in accordance with the general statutes governing national parks . . . ."    *Id*. § 406d-1.    The statute further provides that "[t]he Wyoming Game and Fish Commission ["WGFC"] and the National Park Service shall devise, from technical information and other pertinent data assembled or produced by necessary field studies or investigations . . . and recommend to the Secretary of the Interior and the Governor of Wyoming for their joint approval, a program to *insure the permanent conservation of the elk*

---

[1] The Management Policies are not in the administrative record, but Federal Defendants have agreed that since they represent an official interpretation of NPS's responsibilities in managing the national park system, they may be relied on by the parties and the Court may take judicial notice of them.    *See also* Defendants' Answer (ECF No. 22) at ¶ 25 (admitting that § 1.4 of the *Management Policies* "represents NPS's interpretation of the Organic Act").

*within the Grand Teton National Park* . . . ." *Id.* § 673c(a) (emphasis added).   The statute also

provides that "[s]uch program shall include the controlled reduction of elk in such park, by

hunters licensed by the State of Wyoming and deputized as rangers by the Secretary of the

Interior," but only "when it is *found necessary for the purpose of proper management and*

*protection of the elk*," and even then the hunt may only occur in a portion of the Park specified in

the statute.   *Id.* §§ 673c(a), (b) (emphasis added).

The statute establishing Grand Teton also expressly provides that NPS may not authorize

elk hunting without making a new decision *every year* that killing elk is in fact needed to

conserve elk within the Park.   A recommendation to the Secretary of the Interior concerning

whether and on what terms the hunt should be conducted is to be made "[a]t least once a year

between February 1 and April 1."   *Id.* § 673c(b).   The "yearly plan recommended by" NPS and

WGFC "shall become effective when approved by the Secretary of the Interior and the Governor

of Wyoming," and thereafter NPS must issue "such appropriate orders and regulations as are

necessary to carry out those portions of the approved plan" that fall within NPS's jurisdiction.

*Id.*[2]   Further, "*[i]f and when* a reduction in the number of elk" is incorporated into a plan in any

particular year, then NPS must issue "orders" enumerating the list of "qualified and experienced

hunters" for that year "on or before July 1 of that year . . . ."   *Id.* (emphasis added).

### 3.        The National Environmental Policy Act

NEPA is the "basic national charter for protection of the environment."   40 C.F.R. §

1500.1(a).   The statute is "intended to reduce or eliminate environmental damage and to

promote 'the understanding of the ecological systems and natural resources important to' the

---

[2] In 1975, the authority to approve the annual hunts was delegated by the Secretary to NPS's
Regional Director for the NPS region where Grand Teton is located.   *See* AR 327, 330.

United States."   *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. §

4321).   Hence, "NEPA's core focus [is] on improving agency decisionmaking," *id*. at 769 n.2,

by "help[ing] public officials make decisions that are based on understanding of environmental

consequences," and by "insur[ing] that environmental information is available to public officials

and citizens before decisions are made and before actions are taken."   40 C.F.R. §§ 1500.1(b) -

(c); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (NEPA

analysis "ensures that the agency, in reaching its decision, will have available, and will carefully

consider, detailed information concerning significant environmental impacts").   The Council on

Environmental Quality ("CEQ") — an agency within the Executive Office of the President —

has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500-1508, that are "binding

on all Federal agencies."   *Id.* § 1500.3.

   NEPA and the CEQ regulations provide that all discretionary federal "actions" must

undergo at least some level of NEPA review.   Such actions are defined to include all "new and

continuing activities, including projects and programs entirely or partly financed, assisted,

conducted, regulated, or approved by federal agencies."   *Id.* § 1508.18(a).   With regard to all

"major Federal actions significantly affecting the quality of the human environment," the agency

must, to the "fullest extent possible," prepare an Environmental Impact Statement ("EIS"), 42

U.S.C. § 4332, which must analyze the "environmental impact of the proposed action" as well as

"alternatives" that may avoid or lessen such impacts, *id*. §§ 4332C(i), (iii).

   When it is not clear whether a proposed action will significantly affect the environment,

and thus require the preparation of an EIS, agencies may prepare an Environmental Assessment

("EA"), 40 C.F.R. § 1501.4, which must "provide sufficient evidence and analysis" to support

the agency's decision whether or not to prepare an EIS.  *Id.* § 1508.9(a).   The only circumstance in which an agency may avoid preparing *either* an EIS or an EA in connection with a proposed action is when the action is subject to a "[c]ategorical exclusion" from NEPA review. *Id*. § 1508.4.   However, that designation applies only to a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation" of the NEPA regulations.   *Id*.

In preparing EISs and EAs, and in otherwise implementing NEPA, federal agencies shall "[m]ake diligent efforts to involve the public*."   Id.* § 1506.6(a).   All federal agencies "shall to the fullest extent possible . . . encourage and facilitate public involvement in decisions which affect the quality of the human environment," *id.* § 1500.2, because "public scrutiny [is] essential to implementing NEPA."   *Id*. § 1500.1(b).

### 4.        The Endangered Species Act

Congress enacted the ESA to ensure that "the ecosystems upon which endangered species and threatened species depend [are] conserved, [and] to provide a program for the conservation of such endangered species and threatened species."   16 U.S.C. § 1531(b).   The ESA and implementing regulations prohibit any person from "taking" any member of a threatened species without authorization from the FWS.   *Id.* § 1538(a); 50 C.F.R. § 17.32.   The term "take" is defined broadly to include "to harass," "harm," "wound," or "kill."   16 U.S.C. § 1532(19).   The FWS has further defined the term "harass" to include "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns," including "feeding."   50 C.F.R. § 17.3.

Section 7 requires all federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species."   16 U.S.C. § 1536(a)(2).   To carry out this obligation, the "action agency" must formally "consult" with the FWS before the agency undertakes an action that may affect any listed species.   50 C.F.R. § 402.14.   Such consultation, which must be based on the "best scientific . . . data available," 16 U.S.C. § 1536(a)(2), culminates in a "Biological Opinion" ("BiOp") by the FWS.   If the FWS concludes that the action is not likely to jeopardize the existence of the entire species but will result in any form of "take," the FWS must issue a "written statement" limiting the amount of "incidental take" that is permitted, *id.* § 1536(b)(4), and those "reasonable and prudent measures" that are "necessary or appropriate to minimize" the impact on the species.   *Id.*   Reinitiation of formal consultation is required "where discretionary Federal involvement or control over the action has been retained or is authorized by law," and "the amount or extent of taking specified" in the statement is exceeded, or "new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered."   50 C.F.R. § 402.16.

B.   **STATEMENT OF FACTS**

1.   **Grand Teton and Management of the Elk Herd**

Grand Teton was originally established in 1929 when Congress set aside approximately 150 square miles of the Teton Range.   AR 1959.   In 1943, President Franklin Roosevelt established by presidential proclamation the Jackson Hole National Monument, thereby placing additional lands under federal protection.   *Id.*   In 1950, Congress passed the legislation

establishing Grand Teton as part of the national park system, combining the original park and the monument into a new national park.   *Id.*

Grand Teton was created as a "unit of the National Park System to protect the scenic and geological values of the Teton Range and Jackson Hole, and to perpetuate the park's indigenous plant and animal life."   AR 337 (1976 Master Plan).   The Park's "impressive array of wildlife" includes moose, sheep, pronghorns, black bears, grizzly bears, coyotes, bison, birds, and fish, as well as "[s]izeable bands of elk [that] appear routinely throughout the visitor season in certain easily accessible areas[.]"   AR 343.   Together with Yellowstone National Park, Grand Teton comprises "the strategic core of a vast upland wilderness, which is held almost exclusively within Federal ownership . . . [and which] rivals Alaska in its wilderness qualities and its variety and number of large mammals."   AR 346.

While all of the Park's wildlife is of considerable "scientific interest, and is worthy of protection on its own merit," to many "park visitors its real significance lies in the excitement they feel when spotting a band of elk . . . on a summer evening [or] hearing the indescribable sound of elk bugling on a crisp fall day."   AR 344 (NPS Master Plan).   The ancestors of the elk living in Grand Teton are "generally believed to have crossed the Bering Sea land bridge to North America during periods of Pleistocene glaciation" at least 100,000 years ago.   AR 193. Today, "living in the midst of some of the most superb scenic areas anywhere, the Jackson [] elk herd in western Wyoming persists as one of the two largest herds of native elk in North America."   AR 13.   Grand Teton "lies at the heart of their summer range which also includes a large area in the southern part of Yellowstone National Park."   *Id.*   As the Court of Appeals has succinctly summarized, "[i]t goes without saying that these elk are of considerable ecological,

economic, and cultural value." *Defenders of Wildlife v. Salazar*, 651 F.3d 112, 113 (D.C. Cir. 2011).

Historically, many of the elk migrated from their summer range in Grand Teton to "ancestral wintering grounds on the prairies outside of Jackson Hole." AR 14. By the late 1800s, however, much of the natural migration during winter was impeded by ranches, fencing, poaching, and other human-related pressures on the elk population. *Id*. During several severe winters in the early 1900s, the animals' plight led residents of Jackson to begin the practice of giving the elk supplemental feed. AR 26. It also led Congress, in 1912, to establish the National Elk Refuge ("Refuge") for the purpose of providing a permanent winter home for the elk. *Id.*; *see also* Act of Aug. 10, 1912, Pub. L. No. 62-261, 37 Stat. 293 (codified as amended at 16 U.S.C. § 673) (establishing the Refuge as a "winter game (elk) reserve").

The Refuge is "now a 24,700-acre expanse that the Secretary [of the Interior] holds for the grazing of, and as a refuge for, American elk and other big game animals." *Defenders of Wildlife*, 651 F.3d at 113 (internal quotation omitted); *see also* AR 2091 (map reflecting proximity of Grand Teton to the Refuge). Although the Refuge was created to provide the elk with an abundance of natural winter foraging grounds, *see* AR 376 ("[i]f all the lands now under Refuge administration (24,000) plus the adjacent Forest Service lands, had been available in 1912, the program of winter feeding might never have evolved"), the FWS – which administers the national wildlife refuge system – nonetheless continued the historic practice of supplementally feeding the elk. *Id*.

For many years, "it has become apparent that this practice [of supplemental feeding], though born of benevolence, causes significant problems" for both the elk and other wildlife.

*Defenders of Wildlife*, 651 F.3d at 113.   According to the Department of the Interior — the parent agency of both NPS and the FWS — supplemental feeding leads to a seasonal concentration of elk and bison that is "an unnatural situation that has contributed to . . . an increased risk of potentially major outbreaks of exotic diseases," including the serious disease brucellosis, and "damage to and loss of habitat."   AR 1914.

As the Interior Department has also recognized, this risk of disease "poses an existential threat to the elk and bison and puts the very purpose of the Refuge at jeopardy."   *Defenders of Wildlife*, 651 F.3d at 113; *id*. at 114 ("All agree that supplemental feeding increases the risk of such diseases.   Without supplemental feeding, the elk would gather in smaller groups, meaning that one sick elk would infect only the handful of others around it.   But because the feeding lines bring so many together, the disease of one can quickly become that of many, if not all."). Supplemental feeding also unnaturally increases the total number of elk in the herd which, in turn, has been relied on by NPS as a justification for continuing to authorize the hunting of elk in Grand Teton.   *See, e.g.*, AR 7535 (May 2015 NPS Briefing Statement) ("Supplemental feeding artificially sustains more bison and elk than available winter habitat can support . . . and contributes to the need for harvesting large numbers of elk" in the Park.).

In 1998, this court held that the FWS had failed to adequately address under NEPA the adverse impacts of the supplemental feeding in conjunction with the FWS's proposal to allow the sport hunting of bison that were also being attracted to the supplemental feed provided to the elk. *See Fund for Animals v. Clark*, 27 F. Supp. 2d 8 (D.D.C. 1998) (enjoining the sport hunting of bison pending a comprehensive NEPA analysis).   In response, in 2007, the FWS, along with NPS, issued a "Bison and Elk Management Plan.   *See* AR 1909 ("2007 Plan").

10

The 2007 Plan, accompanied by an EIS, specifically rejected a "No-Action Alternative" of continuing to use supplemental feeding on the Refuge "nearly every winter" in order to "maintain the maximum of 7,500 elk" on the Refuge during the winter months.   *Id*.; *see also* AR 1954 ("[B]ecause winter feeding has such a large effect on the park elk and bison herds, alternatives to the current winter feeding program *must be developed in consideration of the park's purposes*, *as well as the National Park Service's mission and wildlife conservation policies.*") (emphasis added).   Instead, the FWS and NPS committed to a "dynamic framework for *decreasing* the need for supplemental feeding on the refuge," AR 2853 (emphasis added), under which "approximately 5,000 elk would be expected to winter on the refuge."   AR 1920; *see also* AR 1924 ("Reducing supplemental feeding would decrease refuge elk numbers and densities."); AR 2013 ("[A] phased transition from intensive supplemental winter feeding to greater reliance on free-standing forage would help maintain lower elk numbers.").

When the 2007 Plan was subsequently challenged on the grounds that it did not commit the agencies to ending the admittedly deleterious practice of supplemental feeding as rapidly as possible, this court and the Court of Appeals upheld the plan but, as NPS has acknowledged, based only "on the agencies' stated intent in the 2007 [Plan] to end supplemental feeding."   AR 7535 (May 2015 NPS "Briefing Statement").   As the D.C. Circuit stressed, "[i]t is highly significant *and indeed dispositive to us*, as it was to the district court, *that the agencies are committed to ending supplemental feeding*."   *Defenders of Wildlife*, 651 F.3d at 117 (emphasis added); *id*. (the Plan "might well have been unreasonable had the agencies categorically refused to phase out the winter feeding program") (quoting *Defenders of Wildlife v. Salazar*, 698 F. Supp. 2d 141, 148 (D.D.C. 2010)).

Yet, notwithstanding the representations made to the courts that the agencies would "transition away from supplemental feeding" and "phas[e] out the practice over a fifteen-year period," 651 F.3d at 116-17, the admittedly deleterious supplemental feeding on the Refuge has not, in fact, been reduced since the Plan's adoption.   The opposite has occurred: the number of elk being fed with supplemental feed on the Refuge during the winter has gone from *7,279* elk in 2007, when the Management Plan was adopted, to *8,400 elk in 2015*, *see* AR 7535, i.e., there has been a *fifteen percent increase* in the practice that the FWS and NPS acknowledged to the courts and the public was undermining the core conservation mission of both agencies.   *See* AR 7535. Indeed, nearly a thousand *more* elk were on feed this past winter than the 7,500 "maximum" that NPS and FWS said would be fed if the Plan had never been adopted.   *See* AR 1909.[3]

### 2.      NPS's Annual Authorizations Of Elk Hunting In Grand Teton

Grand Teton is the only national park in which native wild animals may "be killed by state-licensed hunters deputized as rangers."   AR 234.   As acknowledged by an NPS

---

[3] Although the FWS and NPS committed in 2007 to finally begin phasing out the admittedly harmful practice of supplemental feeding, the federal agencies, as well as their state counterparts, have known for many *decades* that the practice is extremely harmful to the wildlife and other conservation interests the agencies are duty-bound to protect.   For example, a *1958* Wyoming Game and Fish Commission publication entitled "The Elk of Jackson Hole" explained that the elk become effectively "[d]omesticat[ed]" when on feed in the winter; that "[s]hortly after feeding starts the elk rely upon supplemental feed and make little effort to forage for themselves"; that "[t]heir instinctive alertness largely disappears"; that they "spend most of their time on the feeding area or lying a short distance away"; that they "become almost completely immobile"; and that "[s]uch behavior could greatly increase the rapid spread of infectious disease."   AR 44; *see also id.* ("Even more significant is the resulting damage to the surrounding range.   Browse plants have largely been killed out around most of the permanent feedgrounds.").   The 1958 publication also recognized that the "*only* justification for regular feeding on this range is to maintain more elk than can be supported by natural forage."   AR 46 (emphasis added).   Thus, for more than a half century the agencies have been aware that the practice of supplemental feeding is antithetical to appropriate wildlife management and should be drastically reduced, if not eliminated, and yet the practice continues unabated to this day.

publication, this unusual approach to allowing what is, in effect, a recreational hunt in a national

park was evidently designed to "circumvent an International Treaty for 'Nature Protection and

Wildlife Preservation in the Western Hemisphere' between the United States of America and 17

other countries."   *Id*.   That treaty commits the United States to "prohibit hunting, killing, and

capturing of the fauna . . . in national parks except by or under the direction or control of the park

authorities, or for duly authorized scientific investigations."   *Id*. (internal quotation omitted).   In

view of that treaty obligation, when NPS authorizes state-licensed hunters to kill elk in the Park,

it does so by designating all of the sport hunters as "deputy rangers."   *Id*.

Since the statute establishing Grand Teton *allows*, but does not require, NPS to authorize

an elk hunt in any particular year, NPS has taken the position that authorizing a hunt is a

discretionary management decision that NPS makes on an annual basis when (and only when)

the hunt is in fact found to be "necessary for the purpose of proper management and protection

of the elk," 16 U.S.C. § 673c(a).   Thus, "hunts did not occur" at all on any park lands in 1959

and 1960, and from the very inception of Grand Teton, NPS established a management objective

of "reduc[ing] the need to hunt elk in Grand Teton," especially in view of the wide availability of

"recreational hunting outside park boundaries," i.e., in adjacent state lands and other federal

lands managed by agencies whose missions are not exclusively focused on conservation.   AR

192, 236 (1969 NPS publication).

Indeed, even when the final legislation establishing Grand Teton was being drafted, the

Secretary of the Interior "emphasiz[ed] that not only is *any form of hunting contrary to the basic*

*national park concept*, as well as the statutes enacted by Congress for administration of the

national park system, but that this Department would *much prefer to have the elk herd controlled*

13

*by some other method if a feasible solution could be found*."   AR 547 (emphasis added); *see also* AR 549 (explaining that "[i]n 1964, the agencies with responsibilities for managing the herd recommended 'that yearly management programs for the Northern Jackson Hole Elk Herd have the long-range objective of reducing the need to kill large numbers of elk within Grand Teton'" and that "[t]his objective has remained the same to the present time," as reflected by "annual joint recommendations of the Service and the Wyoming Game and Fish Department ["WGFD"] for the management of elk within the Park"); AR 241 (1969 publication by NPS biologist) (stating that "[a] reduction of Grand Teton's role to standby status, with limited hunts when state programs need assistance, *may be possible within a few years*") (emphasis added).

In a 1976 "Master Plan" for the Park, NPS established a "number of management initiatives" for achieving the Park's paramount objective to "protect and provide for the American people's enjoyment" of the Park's natural splendor "without consumption of those resources."   AR 336.   One such "[i]nitiative" was to "[f]urther reduce unnecessary human intrusion on the park by eventually reducing or eliminating the park's elk-control program."   *Id.* NPS explained that "new insights gleaned from recent problem-oriented research within Grand Teton and Yellowstone National Parks suggest that environmentally regulated ecosystems can ultimately be re-established in Grand Teton," and that "[i]n the context of increasing knowledge of these factors, park management will *continue to work towards the elimination of the need for an elk reduction in the park*."   AR 359 (emphasis added); *see also* AR 336 ("We do not intend to forfeit any of what is unique about Grand Teton National Park in the interests of providing for uses or facilities that are inappropriate to it.").

Similarly, in a 1985 Statement for Management of Grand Teton, NPS reiterated that its objective for "Natural Resource Management" was to "manage all park resources under ecosystem concepts that are aimed to perpetuate natural systems," to "manage wildlife under conditions that are as natural and unrestrained as possible," and to "cooperatively develop a management program that *reduces the need for reduction of elk within the park*."   AR 421 (emphasis added).   The next year, NPS issued a "Natural Resources Management Plan" reiterating that two of the five approved objectives for "properly manag[ing] the natural resources" of the Park and for "achiev[ing] approved management goals for the Park" were to manage wildlife "under conditions that are as natural and unrestrained as possible," and to "develop a management program that *reduces the need for reduction of elk within the Park*." AR 453 (emphasis added).

The Natural Resources Management Plan explained that "[r]educing elk hunting in the Park is an important management objective for the Park," which is "in keeping with the guiding philosophy and policy for managing ecosystems in natural zones of national parks."   AR 553. The agency further advised the public that "[h]unting elk in the Park generally is recognized *as not in keeping with the purposes of national parks*," AR 522 (emphasis added), and that "[h]unting in the Park is *contrary to general Service policy and mandates for managing natural areas, is controversial, alters elk behavior, jeopardizes other wildlife, derogates the quality of the Park's visitor experience, and may threaten visitor and employee safety*."   AR 522 (emphasis added).   Likewise, NPS stated that any continued hunting in the Park would continue "a use which is *contrary to the philosophy and traditional purposes of national parks, would continue to reduce the quality of the traditional park experience for visitors during the fall and*

*early winter* and, perhaps, at other times of the year to the extent that hunting in the Park during fall and early winter disrupts the behavior and distribution of the elk at other times of the year." AR 555 (emphasis added).   NPS also stated that hunting pressure in the Park likely displaces some elk that would otherwise winter in Grand Teton, thereby *increasing* elk numbers in areas where they are supplementally fed, i.e., the Elk Refuge.   *See* AR 554-55 ("Disturbance of elk and other wildlife in the Park by hunting activities from late October through early December would continue to cause use by elk of suitable habitat in the Park from fall through spring . . . with, perhaps, consequent greater than necessary demand on natural and supplemental feed on the National Elk Refuge.").

By the same token, NPS recognized in its Natural Resources Management Plan that various Park-related benefits would flow from eliminating the hunt, including that "[h]uman disturbance of elk in the Park would be reduced, illegal kills of elk and other wildlife probably would be greatly reduced, and opportunities for visitors to view migrating elk east of the Snake River in the Park would be increased."   AR 554.   In addition, elk "would probably spend more time free-ranging on prehistoric winter range in the Park after hunting was eliminated," and the "*park could offer a more traditional and higher quality experience to visitors during fall and early winter if hunting was reduced or eliminated*."   *Id*. (emphasis added).

The 1986 Natural Resources Management Plan concluded that "sincere, informed efforts need to be made to test the hypothesis that conserving and controlling the Jackson elk herd can be accomplished with reduced or no hunting in the Park," AR 553, and NPS declared its intention to initiate an "experimental program" of no or reduced hunting in the Park to obtain the data needed to evaluate the genuine need for the hunt.   AR 477.   Yet such a program, which

NPS acknowledged "would be controversial" with the hunting community, *id.*, was never implemented, while NPS continued to authorize annual hunts.

NPS's and FWS's 2007 Bison and Elk Management Plan – which, as discussed, focused on the myriad adverse impacts associated with supplemental feeding on the Elk Refuge, *see supra* at 11-12 – also stated that the "successful achievement" of the Plan's goals for the Refuge is "critical to meeting NPS mandates for the park."   AR 2993.   The 2007 Plan reiterated that the Park's objective is to "[p]erpetuate *to the greatest extent possible* natural processes and the interactions of bison and elk with natural environmental fluctuations influenced by fire, vegetation success, weather, predation, and competition" while, at the same time, "support[ing] public elk reductions in [Grand Teton] *when necessary*, to achieve elk population objectives that have been jointly developed" by WGFD, NPS, and FWS.   *Id.* (emphasis added).[4]

Nevertheless, since issuance of the 2007 Plan, NPS has continued to make annual decisions authorizing elk hunting in Grand Teton, while continuing to declare the agency's "long-range objective of reducing the need to harvest large numbers of elk within" the Park. AR 1895 (2007 hunt decision); AR 3382 (2008 decision); AR 3933 (2009 hunt decision); AR 4251 (2010 hunt decision); AR 4785 (2011 hunt decision); AR 5582 (2012 hunt decision); AR 6142 (2013 hunt decision); AR 6851 (2014 hunt decision).   In the 2014 hunt, 211 elk were killed in the two principal areas in Grand Teton that remain open to hunting (referred to as hunt areas 75 and 79), including 48 calves.   AR 7370 (1/7/15 NPS e-mail).   NPS issued 616 licenses to hunt in the Park.   AR 7374.

---

[4] As discussed further below, although the 2007 Plan refers to "jointly developed" population objectives, in considering the "necessity" of the hunt NPS has in fact relied on *WGFD's* unilaterally established "elk herd objective of 11,000" animals for the entire herd, some of which depends on habitat in Grand Teton as well as the Elk Refuge.   *See infra* at 42.

In April 2015, the staff of NPS, along with WGFD, again issued a "Joint Field Recommendation" "concerning elk management within Grand Teton National Park for the year 2015."   AR 7456.   The recommendation states – as NPS has stressed for many years – that the "*proposed program has the long-range objective of reducing the need to harvest elk within*" Grand Teton, "continuing progress towards restoring historic distribution and migration patterns, and encouraging elk to use historic fall and winter range areas in the southern half" of Grand Teton.   *Id.* (emphasis added).   The joint recommendation also states that the Jackson Elk Herd population was "estimated at approximately 11,000 elk in February 2015," which is consistent with WGFD's "herd objective of about 11,000 for the Jackson elk herd."   AR 7456-57. Nonetheless, the recommendation "conclude[s] that a reduction of the herd in [Grand Teton] in 2015 is necessary for the proper management and protection of the elk," although it sets forth no underlying rationale or documentation to support such a conclusion.   *Id.*   The recommendation further establishes a "[h]arvest objective" of 300 elk that may be killed in the two primary areas open to hunting – 89 more than were killed in the hunt last year and 85 more than were killed in the Park hunt in 2006, *see* AR 3421 – the year before the FWS and NPS declared their intention to transition away from reliance on the supplemental feeding program that unnaturally inflates the elk population.

The NPS staff's 2015 recommendation acknowledges that the 2007 Plan committed the FWS and NPS to an "objective" of "reduc[ing] the number of elk on supplemental feed," but that "[m]anagement data indicate the portion of the Jackson elk herd wintering on lands within the [Elk Refuge] numbers approximately 8,400 animals during the 2014-2015 winter," and that the "*number of elk on the refuge has been above the objective (5,000) for 6 of the past 7 winters.*"

18

AR 7456 (emphasis added).   However, while relying on the 2007 Plan's "goal of 5,000 elk"

wintering on the Refuge as a rationale for "a harvest of elk that summer in [Grand Teton]," the

recommendation does not explain how that "goal" can or will ever be satisfied while the

extensive supplemental winter feeding of elk continues – and *increases* – notwithstanding the

2007 Plan's acknowledgement that it must be phased out.

The staff's 2015 "field recommendation" was subsequently embodied in a formal "Joint

Recommendation" by NPS and the Wyoming Game and Fish Commission, which was approved

by NPS's Regional Director and the Governor of Wyoming in May of this year.   AR 7545.   As

in past years in which this same process has been followed, NPS engaged in no NEPA review

whatsoever with respect to the annual decision to authorize hunting in a national park.   Nor did

NPS make any "impairment" determination in connection with the approved hunt, as required by

the Park Service Organic Act and the agency's own Management Policies.

### 3.	The Agencies' ESA Section 7 Consultation Regarding Impacts Of The Elk Hunts On Threatened Grizzly Bears

In connection with developing the 2007 Plan, NPS and the FWS engaged in formal

consultation under Section 7 of the ESA because of the adverse impacts the supplemental

feeding program and elk hunt have on the threatened grizzly bear.   The FWS subsequently

issued a 2007 Biological Opinion, recognizing that "[i]solation from human activities is

extremely important for bear survival, due to the tendency of grizzly bears to rapidly habituate to

human foods," but that "[h]uman-bear interactions [had] been increasing" in the area and that the

"greatest increase in [grizzly mortalities in] recent years is self-defense in fall by big game

hunters."   AR 6436; *see also* AR 6442 (explaining that "[h]unting-related deaths resulting from

human-grizzly conflict remain the most-significant source of known grizzly bear mortality" in

the Greater Yellowstone Ecosystem).   Nonetheless, because the FWS determined that the "increased risk would be minimal in the long term as a result of the proposed action" in the 2007 Plan, AR 6449 – under which "supplemental feeding would be reduced from current levels and replaced by greater ungulate reliance on standing forage," AR 6444 – the FWS authorized only a single grizzly bear to be "lethally taken through hunting-related conflicts" over the fifteen-year life of the plan.   AR 6450.

On Thanksgiving Day in 2012, a man and his two young sons[5] – all of whom had been "deputized" as federal Park rangers for purposes of the hunt – had a "surprise encounter with an adult male grizzly bear near an elk carcass," which "resulted in the bear's death by being shot by the hunters."   AR 5863 (11/22/15 NPS "Case Incident Record"); *see also* AR 5879-87 (photos of dead bear).   Because this development meant that no additional grizzly bears could be lawfully "taken" in connection with any actions "related to the ERP during the remaining nine years of the [2007] plan's intended 15-year life span," NPS and FWS reinitiated formal consultation.   AR 6148-52.   NPS's request for reinitiation stated that "grizzly bear distribution and numbers in the south end of the park appear to have increased" since the 2007 Plan was issued, and that "[s]ince 2007, several grizzly bears have been observed seeking out gut piles left on the landscape" by elk hunters – i.e., the intestines and other remains of the elk that are discarded by the hunters – and that "[w]e believe this behavior and the risk of hunter-grizzly bear contacts will continue to be relatively high as long as the ERP is necessary."   AR 6149; *see also* AR 6151 ("continued implementation" of the hunts "is likely to incur additional losses of grizzly bears from hunter-grizzly bear conflicts, which will adversely affect grizzly bears").

---

[5] Their age is not specified, but they are referred to as "boys" in the NPS investigatory file.   AR 5863.

In response, in September 2013, the FWS issued an "Addendum" to the 2007 Biological Opinion, along with a new incidental take statement, that authorized the take through hunting-related mortality of "*up to 4 additional grizzly bears in the Park* and 2 grizzly bears on the Refuge . . . during the remaining 9 years this biological opinion is valid."   AR 6426 (emphasis added).   The Addendum provided no explanation as to how it derived these specific "take" figures, which dramatically increased the permitted take of threatened grizzly bears.   And, while the FWS agreed that continued hunting of elk in Grand Teton "is likely to incur additional losses of grizzly bears from hunter-grizzly bear conflicts," AR 6423, the Addendum did not impose any new measures with which NPS must comply to ensure that the new take limit is not exceeded. In addition, while recognizing that grizzly bears have been "seeking out gut piles left on the landscape" during the hunt, AR 6422 – thus disrupting their natural feeding behaviors – the FWS did not analyze at all, let alone include in the newly authorized incidental take of the bears, this additional form of "take" by "harassment."   *See* 50 C.F.R. § 17.3 (defining "harass" in the definition of "take" to include actions that "significantly disrupt normal behavioral patterns, which include . . . feeding").

## ARGUMENT

## I.   STANDARD OF REVIEW

In reviewing the validity of agency action under the APA, the Court must "immers[e]" itself in the administrative record, *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976), and conduct a "thorough, probing, in-depth review" of the facts to determine whether the agency's decisions were based on the "relevant factors" and legally mandated procedures.   *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971).   In doing so, the Court must

assess whether the agency has "failed to consider an important aspect of the problem," or

"offered an explanation for its decision that runs counter to the evidence" before it.   *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## II.     NPS'S AUTHORIZATION OF ELK HUNTING IN GRAND TETON IN 2015, AS IN PAST YEARS, VIOLATES NEPA[6]

### A.     When, As In 2015, NPS Makes New Decisions Regarding Whether, And On What Conditions, To Authorize Elk Hunting in Grand Teton, It Does So Without Complying With NEPA In Any Manner.

As discussed previously, under NEPA and implementing regulations, when a federal

agency undertakes any "new" or "continuing activities" affecting the environment, including any

such projects and programs "entirely or partly financed, assisted, conducted, regulated, or

approved by federal agencies," 40 C.F.R. § 1508.18(a), the agency must comply with NEPA

through preparation of an EIS or an EA.   *See supra* at 5-6.   The only exception to that mandate

is when the agency has properly invoked a "categorical exclusion" in the administrative record.

40 C.F.R. § 1508.4.   Here, however, although NPS makes (and, pursuant to statute, *must* make)

a new discretionary decision every year concerning whether, and on what specific terms, to

authorize the elk hunt in a national park, the agency fails to comply with *any* of these NEPA

requirements.   Thus, in 2015, as in past years, the agency indisputably took an "action" within

the meaning of the statute and the CEQ regulations – in the form of a formal decision document

signed by the Regional Director of NPS in May of this year, specifically authorizing the killing

---

[6]   Plaintiffs are wildlife photographers who spend an enormous amount of time in the Park each year and whose enjoyment of the Park and its native wildlife, as well as their ability to practice their craft, is seriously impaired by the annual hunts.   *See* Pl. Ex. A, B (standing declarations). Accordingly, they easily satisfy the standards for Article III standing.   *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.") (citation omitted).

of elk in Grand Teton.  *See* AR 7545.   Yet NPS did not prepare either an EIS or EA in connection with that action.   Nor did the agency invoke a Categorical Exclusion purporting to exempt the 2015 decision (or any other annual decision authorizing a hunt) from NEPA review. Thus, NPS is in flagrant violation of NEPA.

Indeed, the very narrow circumstances where agencies may bypass any NEPA review involve situations where preparation of a NEPA document analyzing impacts and potential alternatives "would serve 'no purpose'" in the agency's decisionmaking process because the agency has "no discretion" whatsoever to take those impacts into consideration.   *Public Citizen*, 541 U.S. at 767-70.   In contrast, where an agency's statutory authority affords it *any* leeway to take environmental concerns into consideration in formulating its decision and, "perhaps more significantly," where a NEPA process may "provid[e] a springboard for public comment in the agency decisionmaking process itself," it is critical that the "policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government."   *Id*. at 768-9 (internal quotation marks and citations omitted); *see also Sierra Club v. U.S. Dep't of Agric.*, 777 F. Supp. 2d 44, 66 (D.D.C. 2011) ("an agency's role must be considered 'merely ministerial' to avoid the application of NEPA"; where an agency had "sufficient leverage to take the environmental impacts of its actions into account when making decisions" on a loan guarantee and to impose environmentally protective conditions, NEPA compliance was required).

Here, the statute creating Grand Teton cannot reasonably be construed (and in fact has *not* been construed by NPS) as depriving the agency of any discretion to consider impacts and alternatives when it annually considers whether to authorize a hunt and, if so, on what specific conditions.   To the contrary, once again, Congress allowed hunting in Grand Teton only "when

it is *found necessary for the purpose of proper management and protection of the elk*," and as

part of a program to "insure the permanent conservation of the elk" within the Park.   16 U.S.C.

§ 673c(a) (emphasis added).   The statute further provides that the "orders and regulations"

promulgated by NPS "for the management, protection, and control of the elk *for that year*" are to

"include provision for controlled and managed reduction by qualified and experienced hunters

licensed by the State of Wyoming and deputized as rangers" by NPS, but only "*if and when a*

*reduction in the number of elk by this method within [Grand Teton]* is required as a part of the

approved plan *for the year . . . .*"   *Id*. § 673c(b) (emphasis added).   Consequently, the statute

unequivocally confers discretion on NPS, and further instructs that such discretion must be

exercised anew by NPS in its decisionmaking *each year*.   *See also* 36 C.F.R. § 2.2(b)(2) (NPS

regulations providing that "[h]unting may be allowed in park areas where such activity is

specifically authorized as a discretionary activity under Federal statutory law *if the*

*superintendent determines that such activity is consistent with public safety and enjoyment, and*

*sound resource management principles*") (emphasis added).

     Nor is there anything in the administrative record suggesting that NPS lacks any

discretion in determining whether, and on what conditions, to authorize elk hunting.   To the

contrary, NPS itself has rejected any notion that it *must* approve elk hunting in Grand Teton, let

alone that it must do so on any particular set of conditions.   Thus, the agency has recognized, in

keeping with the plain terms of the statute establishing the Park, that "[t]he expansion of Grand

Teton National Park in 1950 *allowed* for elk reduction in the park when necessary to manage the

herd.   *This reduction is not mandatory*."   AR 2719 (2007 Plan) (emphasis added).

Accordingly, NPS has long conceded that it does and must make a *new determination every year* concerning whether the hunt is needed and, if so, on what terms and conditions.[7]

The record also confirms that, far from being a legal formality with which NPS can dispense, NPS's compliance with NEPA when it makes annual determinations as to whether a hunt is "necessary" and, if so, what that hunt will entail – in terms of size, timing, location, proximity to roads and homes, measures to reduce impacts on grizzly bears and other affected wildlife, and other pertinent environmental considerations – is essential to provide the concerned public the assurance that the agency "has indeed considered environmental concerns in its decisionmaking process," as well as to afford the public an opportunity to provide input as to impacts and less harmful alternatives.   *Balt. Gas & Electric Co.*, 462 U.S. at 97 (citation omitted).   Since this case concerns the total lack of *any* NEPA compliance in connection with those decisions – in contrast to the usual NEPA case in which the question before the Court is the *adequacy* of the agency's NEPA document – the following are simply some examples of the kinds of issues that cry out for some agency consideration and public involvement in a legally compliant NEPA process when NPS is considering whether to authorize any particular hunt.

**First**, NPS itself has repeatedly acknowledged the increasing environmental and management problems arising from hunter interactions with threatened grizzly bears, resulting not only in the potential for bears being killed – as occurred in 2012 – but also serious

---

[7]   *See, e.g.*, AR 2723 (2007 Plan) ("As set out in the law, hunters participating in the controlled reduction of elk (*when necessary for proper management*) are licensed by the state and are deputized as park rangers.   *The law does not require that the park have an elk reduction program if herd growth does not warrant it*.") (emphasis added) (internal citation omitted); AR 2766 (2007 Plan) ("The 1950 legislation authorizing the expansion of Grand Teton National Park *allowed* for elk reduction in the park *when necessary to manage the herd*.") (emphasis added); AR 5168 (10/31/11 letter from Grand Teton Superintendent acknowledging that there have been "years when biologists determined it was not necessary to reduce segments of the elk herd").

impairments in the bears' natural feeding behaviors as they are attracted to "gut piles" left behind

by hunters.  *See, e.g.,* AR 7535 (May 2015 NPS Briefing Statement) ("Recent hunter-grizzly

bear conflicts in the park have highlighted the effects of the program on other park resources and

values, including the protection of grizzly bears").[8]

Indeed, a study being conducted by NPS biologists along with other federal scientists is

predicated on the fact that "[r]ecent human-bear conflicts within [Grand Teton], including the

mauling of an elk hunter in 2011 and the death of a grizzly bear in 2012 in an elk-hunting related

incident in 2012 . . . *are emblematic of the critical and unprecedented challenges that [Grand*

*Teton] managers now face*."  AR 7540 (May 2015 NPS permit) (emphasis added).   According

to the scientists, "[o]ne particular challenge is the availability of ungulate gut piles and carcasses

during fall hunting season, a time when bears' caloric demand and intake is greatest," resulting

in a "highly attractive grizzly bear food source that may exacerbate the potential for bear-human

---

[8]  *See also* AR 5909-10 (November 2012 NPS Briefing Statement) ("In light of the fact that
grizzly bears have over the last several years extended their range to encompass the entire park,
and the significant public interest in the welfare of these animals, the incident [in which a grizzly
was killed by hunters] has drawn attention to the *conflicts inherent in maintaining an artificially
high population of elk that results in a hunt within a national park, thereby putting other wildlife
at risk*.") (emphasis added); *id.* ("Public concern for protection of grizzly bears and opportunities
for public enjoyment of them in Grand Teton has heightened as bears have visibly expanded
throughout the park . . . *The park expects continued conflict between elk management and grizzly
bear conservation goals as a result of elk reduction program activities*.") (emphasis added); AR
6085-86 (NPS January 2013 Briefing Statement) ("[Grand Teton] expects continued conflict
between the elk reduction program and other goals, especially those for grizzly bear
conservation."); AR 6766 (NPS April 2014 Briefing Statement) (stating that the "killing of the
grizzly bear elevated the public's interest in welfare of the bears and pointed to the
inconsistencies of the hunt with other park management objectives . . . The Park anticipates that
conflicts between hunters and grizzly bears will continue since the bears have expanded their
range to encompass the entire park in recent years.   Gut piles left behind by hunters are also a
readily available source of nutrition for bears in the fall and contribute to their presence in the
hunt area.").

conflicts," potentially resulting in bears being shot or otherwise removed from the Park, and "creat[ing] a unique and substantial challenge for wildlife managers at [Grand Teton]."  *Id.* The scientists explained that, even with measures intended to mitigate such impacts, Grand Teton managers "expect conflicts between elk hunters and grizzly bears to increase," *id.*, an anticipated impact that should be analyzed in a NEPA document with appropriate public input. *See* AR 5585 (2012 letter from Sierra Club) (urging NPS to "undertake a formal Environmental Analysis" in view of "changing conditions" in the Park, including the "substantial increase in the grizzly bear population in the park, which results in bears "becoming habituated to the human-caused food source of elk offal and other hunt remains").[9]

**Second**, as a related matter, the fact that, in recent years, top predators such as grizzly bears and wolves have returned to Grand Teton in large numbers calls into serious question the extent to which hunting is necessary to keep elk populations in check at all notwithstanding the impact of supplemental feeding on the Elk Refuge.   Predators historically preyed on large numbers of elk, *e.g.*, AR 22, 67 (explaining that wolves historically killed 1,000 elk each year in Jackson Hole), but were essentially eliminated during most of the time frame when the hunt has been conducted.   *Id.*   Only recently have they again begun to play a significant role in maintaining a natural ecological equilibrium in the Park – a role that could be much larger in the absence of the hunt.   *See* AR 7299 (10/25/14 article quoting NPS official as explaining that

---

[9] The FWS's "Addendum" to its Biological Opinion also found that there would be a four-fold increase in the number of grizzly bears "incidentally taken" than the agency predicted in 2007. *See* AR 624.   That finding reinforces the need for NPS to engage in NEPA compliance in view of the increasing threats to a federally threatened species.   *See Fund for Animals v. Hall*, 448 F. Supp. 2d 127, 136 (D.D.C. 2006) (holding that the "analysis required by NEPA" differs from the analysis in a section 7 consultation "in a number of important ways," including that the "section 7 consultation process fails to provide for public comment in the same way that NEPA does").

given the return of the grizzly bear and wolf to the ecosystem, "[n]atural regulation is playing a

much larger part in the park than it did in the last 50-60 years"); AR 7344 (11/25/14 article from

a Grand Teton visitor) (questioning how it can be necessary to hunt elk in a national park

"despite the wolf and grizzly populations that have supposedly rebounded  . . . Wolves prey on

elk year-round, while grizzlies kill many newborn calves").

As explained by Dr. Franz Camenzind, who has studied wildlife in the Grand Teton area

for many years and was the Executive Director of the Jackson Hole Conservation Alliance:

> it is safe to say that these top carnivores along with other large carnivores are
> having an impact on the park's elk population . . . [A]side from the agency's elk
> management program, the native predators may very well have capped off what
> managers have been trying to accomplish for the past 60 years – that is to *bring
> the elk's numbers to levels reflecting natural conditions*.  Stated another way,
> *the park's elk population may be at or close to a level that will insure the permanent
> conservation of the elk within [Grand Teton] – without an annual hunt*.

AR 5190 (emphasis added).[10]

**Third**, NPS itself has called attention to the hunt's increasing "conflicts with other park

management goals *including visitor enjoyment* and opportunities for wildlife viewing."   AR

5909 (NPS November 2012 Briefing Statement) (emphasis added).[11]   Indeed, the record is

---

[10] *See also* AR 253 (NPS) ("Man was obviously less successful than the original predator fauna
in allowing the elk population to maintain its numbers and distributions in relation to suitable
habitats and food sources*.*"); AR 4827 (scientific study) (grizzly bears are a "major calf
predator"); AR 5261 (2012 NPS Science and Resource Management Report) ("describing
activity of 2 grizzly bear families totaling 7 bears that were frequently observed hunting elk
calves this summer" and stating that a "wolf pack also used this area"); AR 2740 (NPS) (there is
a "growing presence of wolves within Jackson Hole"); AR 7377 (1/15/15 FWS report)
(describing "many wolves" in the area); AR 3373 (2008 FWS report) (documenting "elk
mortalities" on the Elk Refuge that were suspected of being "wolf related"); AR 3386 (2008
FWS report) (documenting that wolves "have killed at least 3 elk on the feedgrounds"); AR 4490
("[w]ithin the occupied range of the Jackson Elk Herd Unit there are seven packs of wolves").
[11] *See also* AR 4/23/15 e-mail from an NPS official ("hunting in a national park is
counterintuitive to the purpose of the park"); AR 5923 (12/14/12 "Elk Reduction Program
Meeting") ("The short-term goal is to mitigate effects of the elk reduction program on visitor

replete with documentation of Park visitors' recent experiences in which the hunt proved to be the antithesis of what they expected upon visiting a national park.   *See, e.g.*, AR 7331 (11/20/14 article) (describing the experience of visitors observing hunters who "drove a herd of elk from a non-hunt zone and toward an awaiting firing line" along a road); AR 7342-44 (11/25/14 article by photographer) ("I saw myself pointing the camera at the elk, only to have one collapse to the ground in front of me . . . My thoughts were on people driving into the beautiful folds of the Tetons and being greeted by the *crack* of rifles, blood, and corpses, right next to the highway . . . Hearing gun fire and watching wildlife fall before my eyes is not why I visit national parks.").

**Fourth**, non-hunting visitors to the Park not only complain that the hunt ruins their enjoyment of Grand Teton, but they have also expressed serious safety concerns in view of reports – including from NPS itself – of inadequately trained "deputized" hunters, some as young as twelve years old, shooting in close proximity to roads and homes.   *See, e.g.*, AR 7345 (11/25/14 article) ("Tourists and locals that come into the park hear continuing gun shots and it feels like they could be hit at any moment . . . Houses in the Antelope Flats area have many bullet holes in them."); AR 6927 – 30 (NPS report on incidents in 2014, including multiple instances of "shooting from a roadway"); AR 7375 (1/14/15 NPS meeting notes) (referring to six cases of "[s]hooting from/along/on roadway"); AR 7233 (7/30/14 e-mail from Park visitor) (describing the "gross negligence of [Grand Teton] in posting, communicating, and enforcing the one half (1/2) mile closed zones from buildings").[12]

---

experiences and other resources."); AR 6085 (NPS January 2013 "Briefing Statement") ("The conflicts between interagency elk management and visitor interest in viewing and protecting other wildlife prompt NPS to review the elk reduction program.").

[12]   Although NPS is required by statute to "deputize" only "qualified and experienced hunters," 16 U.S.C. § 673c(b), in fact the agency simply defers to WGFD's licensing standards, which are not strict.   *See* AR 7352 (11/28/14 editorial) (explaining that "[w]hile hunters may be 'qualified'

**Fifth**, in view of these and other evolving conditions, NPS frequently makes "major

changes" to the hunt's timing, location, restrictions, and other factors bearing directly on

environmental impacts and potential alternatives for avoiding or minimizing impacts.   *See* AR

7246-47 (9/3/14 "summary of the major changes to the ERP [Elk Reduction Program] in last 2

years"); AR 7288 (10/25/14 article) (quoting NPS official as stating that NPS has made

"significant change[s]" in the hunt over the last several years).[13]

This is by no means an exhaustive list.   Rather, it merely illustrates that the "hard look"

at impacts and alternatives that NEPA demands – but that NPS is repeatedly sidestepping when it

approves the hunt every year – would by no means be an empty exercise but, rather, would serve

the vital purpose NEPA was enacted to further.   Indeed, ironically, at a meeting of NPS and

other government officials, the participants opined that "[t]here is a lot going on with this herd"

and that the "public is not aware of all that goes on and how much we really know about it," and

they wondered whether there is a mechanism for "presenting factual research data to [the] public

---

by simply meeting Wyoming Game and Fish hunter safety and license requirements, there
currently is no litmus test for 'experienced.'   Hunters as young as 12 may participate, becoming
deputized park rangers for the duration of the hunt."); AR 7175 (7/16/14 e-mail) (explanation by
Plaintiff Mayo that he has been able to obtain a license to hunt in the Park without having to
establish any credentials or facility in use of firearms).

[13]   *See also* AR 7378 (2/2/15 NPS meeting notes) (recommending change in the dates for the
2015 hunt to correspond to hunt on Elk Refuge); AR 5923-26 (12/14/12 "Elk Reduction Program
meeting") (discussion of various options for "near-term" and "long term" changes in the hunt,
including a review of the "elk reduction program effectiveness over time and model future
outcomes or recommend options"); AR 6085-86 (NPS January 2013 "Briefing Statement")
("The park recommends program changes, including procedures to reduce hunter conflicts with
other visitors and resources"); AR 7256 (10/14/14 "Elk Reduction Program Meeting") (agency
discussion of, e.g., "ERP changes," "Grizzly bear-hunter interaction," "Non-lead ammunition,"
"Law Enforcement Issues"); AR 7258 (describing "2013 ERP changes").   The fact that some of
these changes are designed to ameliorate the adverse impacts of the hunt confirms, rather than
negates, the need for NEPA compliance.   *See* 40 C.F.R. § 1508.27(b)(1) (impacts that must be
analyzed in a NEPA document "may be both beneficial and adverse.   A significant effect may
exist even if the Federal agency believes that on balance the effect will be beneficial").

rather than have them speculate and make conjecture about [the] impact of different factors."
AR 4843 (2011 Jackson Hole Cooperative Elk Studies Group).   There is such a mechanism: the
NEPA process.   And if NPS follows that process – as it must – it will not only be complying
with the law, but it will better serve its *own* interests in having an open dialogue with the
interested public on matters of environmental concern and controversy.

> **B.    NPS Has No Lawful Justification For Failing To Comply With NEPA When It Makes Decisions Regarding The Elk Hunts.**

The administrative record contains no justification for NPS's failure to comply with
NEPA when the agency makes its new decisions on the hunt every year.   Certainly, the fact that
the hunt has been going on for many years affords no basis for ignoring NEPA compliance when
*new* decisions are made.   *See Fund for Animals v. Clark*, 27 F. Supp. 2d at 13.   Likewise, it is
"inapposite" to NEPA's applicability whether the elk feeding was first "begun before the
enactment of NEPA."   *Id*.   Indeed, in rejecting the argument that the FWS's supplemental
feeding of elk did not implicate NEPA because it had been ongoing for many years, and
preceded NEPA's adoption, this court explained that "[p]articularly[] since Congress intended
for compliance with NEPA by federal agencies to be to the 'fullest extent possible,' each agency
must examine its programs at 'every stage where an overall balancing of environmental and non
environmental factors is appropriate and where alterations might be made in the proposed action
to minimize environmental costs.'"   *Id*. (quoting *Calvert Cliffs' Coordinating Comm., Inc. v.
U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114-18 (D.C. Cir. 1971)).   Similarly, since each
new hunt decision affords NPS an opportunity to engage in a "balancing of environmental and
non environmental factors," and to determine whether and what kinds of "alterations might be
made" in any authorized hunt so as to "minimize" the kinds of impacts delineated above, this is

31

the paradigmatic situation where NEPA compliance is essential to fulfill NEPA's fundamental

"action-forcing" function of ensuring that "environmental concerns are . . . interwoven into the

fabric of agency planning," *Andrus v. Sierrra Club*, 442 U.S. 347, 351 (1979).

Nor does the fact that NPS and FWS prepared a programmatic EIS in 2007 in connection

with the 2007 Bison and Elk Management Plan obviate the need for NPS to *also* comply with

NEPA when it makes new, discretionary decisions on the hunt every year.   Even if the 2007

Plan, which committed the FWS and NPS to a phase-out of supplemental feeding on the refuge,

were being scrupulously implemented – which is not the case – nothing in the Plan or its

accompanying NEPA analysis purported to supplant the need for NEPA compliance when NPS

makes new discretionary decisions to authorize elk hunting in a particular year.

To the contrary, the 2007 Plan was designed to provide general "guidance on managing

the Jackson bison and elk herds within our jurisdictions over a 15-year period," AR 3063, and, as

adopted, the Plan "emphasizes adaptive management" on the rationale that "changing

conditions" will require NPS and FWS to make site-specific decisions based on evolving

developments and information.   AR 2703.   With respect to the hunt in Grand Teton in

particular, NPS advised the public that "[s]pecifics about the logistics of the elk reduction

program in the park are *not included in this type of management plan so that managers can*

*adjust to conditions and change locations or strategies, such as the antlerless emphasis, as*

*warranted by management needs or conditions*."   AR 2592 (response to comments on the

Management Plan) (emphasis added).   Where, as here, NPS expressly disclaimed any "probing

discussion of these or like issues," and, rather, made clear that the 2007 EIS "was not intended as

a NEPA process for [the] site-specific [elk] hunting" decisions that must be made by law every

32

year in light of "changed circumstances," NEPA compliance on each such decision with

environmental implications is plainly required.   *Fund for Animals v. Mainella*, 283 F. Supp. 2d

418, 433 (D. Mass. 2003) (holding that an NPS EIS and General Management Plan concerning

the Cape Cod National Seashore, another unit of the national park system, did not obviate the

need for site-specific NEPA compliance on NPS's specific hunting decisions).

Moreover, the 2007 Plan and EIS did *not* commit NPS to authorize hunting in any

specific year encompassed by the fifteen-year Plan, let alone stipulate the conditions for any such

hunt.   Rather, NPS repeatedly stressed that the "elk herd reduction program in the park" would

only be used "*when necessary*" in order to "assist the state in managing herd sizes, sex and age

ratios, and summer distributions" in light of WGFD's desire to "maintain the Jackson elk herd at

the state's objective of approximately 11,000 animals."   AR 2853 (2007 Plan) (emphasis

added); AR 3065 (2007 Record of Decision) (plan objective is to "*[p]erpetuate to the greatest

extent possible, natural processes* and the interactions of bison and elk with natural

environmental fluctuations influenced by fire, vegetation, weather, predation, and competition,"

and to use hunting in Grand Teton only "*when necessary*, to achieve elk population objectives*")

(emphasis added); *see also* AR 1994 (EIS); AR 2009 (EIS); AR 2240 (EIS); AR 3065 (Record of

Decision).   Accordingly, when NPS is *deciding* whether a particular hunt is "necessary," that

decision requires NEPA review.[14]

Finally, any reliance by NPS on the 2007 Plan as a basis for avoiding NEPA review on

individual hunt decisions would be especially tenuous in view of the fact that the Plan is *not* even

---

[14] Indeed, even under the "no action" alternative discussed in the 2007 EIS – which was
purportedly rejected in the 2007 Plan – hunting in the park would occur only "when necessary."
AR 1919; *see supra* at 11.

being carried out according to its plain terms (and as it was presented to the courts to pass

judicial muster).   Although the FWS's and NPS's Plan "clearly states that the FWS intends to

*progressively reduce* the use of supplemental feeding on the National Elk Refuge," AR 3075

(ROD) (emphasis added), eight years following the Plan's issuance the opposite has occurred –

far *more* elk are being fed on the Refuge than in the year before the Plan was adopted.   *See*

*supra* at 12.   As NPS has conceded, the number of elk on supplemental feed on the Refuge is

"considerably above the objective" in the Plan, AR 7535 (May 2015 NPS "Briefing Statement"),

and hence this "major objective of the 2007 [Plan] *is not being met . . . .*"   AR 7378 (2/2/15

meeting notes) (emphasis added); *see also* AR 7382 (2/23/15) (NPS report) ("With elk numbers

over 8,300 for a second year in a row, *clearly we are not meeting our objective* of 5,000 elk on

[the Elk Refuge] *and as a result we are not reducing our reliance on supplemental feed.*")

(emphasis added).[15]

Thus, even if the 2007 Plan had purported to predetermine NPS's annual hunting

decisions – which it did not and could not – a Plan that is concededly not being implemented so

as to meet its central management objective could not, in any event, be relied on as a basis for

avoiding NEPA analysis as to subsequent agency decisions.   *See, e.g.*, *Or. Envtl. Council v.*

*Kunzman*, 714 F.2d 901, 904-05 (9th Cir. 1983) (finding that a programmatic EIS could not

---

[15] The record reflects NPS's and FWS's concerns that the WGFD will *never* agree to phase out supplemental feeding as called for by the 2007 Plan.   *See* AR 7535 (May 2015 NPS Briefing Statement) ("The [Elk Refuge] and [Grand Teton] anticipate resistance from WGFD to include . . . a process and desire to phase out feeding on the [Elk Refuge].").   This "resistance" may explain why the phase-out of supplemental feeding is not occurring despite the Interior Department's "assur[ance]" to the Court of Appeals "in [its] briefs and at oral argument . . . that Wyoming has no veto over the Secretary's duty to end a practice that is concededly at odds with the long-term health of the elk and bison in the Refuge."   *Defenders of Wildlife*, 651 F.3d at 118 ("tak[ing] the Secretary [of the Interior] at his word" that Wyoming has no such "veto").

fulfill an agency's NEPA obligations in implementing a specific project because the "project described in the [programmatic document] differed significantly" from the project as implemented); *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Service*, No. 2:05-CV-0299, 2006 WL 1991414, at *7 (E.D. Cal. July 14, 2006) ("[T]he Forest Service cannot defer on a site-specific analysis simply by referring to a broad programmatic document . . . which may be outdated or no longer scientifically substantiated."); *see also* 40 C.F.R. § 1502.9(c) (providing that agencies"[s]hall prepare supplements" to EIS's when the "agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

## III.   NPS AND FWS ARE IN VIOLATION OF THE ESA

As explained previously, when NPS and FWS reinitiated formal consultation following the hunting-related death of a grizzly bear in Grand Teton, the FWS issued an "Addendum" to its Biological Opinion that did not require any additional measures for avoiding or minimizing adverse impacts but set forth a significant increase in the number of grizzly bears that the FWS anticipated would be killed (and authorized to be taken) as a consequence of "grizzly bear mortalities by hunters participating in the ERP . . . ."   AR 6424.   As Plaintiffs have previously advised the Court, *see* ECF No. 29 at 2 n.1, they have coordinated with the plaintiffs in *Sierra Club v. Jewell,* Civ. No. 15-479 – which also challenges the Addendum – in an effort to minimize duplication in briefing.   Accordingly, Plaintiffs incorporate by reference the *Sierra Club* Plaintiffs' discussion of the challenges that are common to both cases, namely, claims that (1) an "Addendum" to a Biological Opinion cannot discharge the FWS's and NPS's obligations

under section 7 of the ESA, and (2) the FWS violated the ESA and acted arbitrarily and capriciously by failing to impose any additional measures to minimize the increased anticipated taking through hunter-related mortality.   *See* ECF No. 26 in 15-479, at 21-30.

There are two additional reasons why the Addendum, and NPS's reliance on it, cannot be sustained.   First, the cursory Addendum sets forth no methodology at all for how the FWS decided that four additional grizzly bears would be taken as a result of conflicts with hunters in Grand Teton.   *See* AR 6424.   The Addendum speaks in general terms about the FWS's "anticipat[ion] [of] an increase in the number of grizzly bear/hunter conflicts and subsequent mortality within the Park," but provides absolutely no indication as to how the FWS arrived at the number of "*4* additional grizzly bears" that the FWS "anticipates . . . may be incidentally taken . . . during the 9 years this biological opinion is valid," *id*. – as opposed to, say, five, ten, or twenty bears.   Under elementary APA principles, an agency must "'articulate a satisfactory explanation' for the agency's action" in order for that action to survive judicial review.   *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (quoting *State Farm*, 463 U.S. at 43). Here, however, the pertinent decision document sets forth no explanation whatsoever for its critical choice of the number of a threatened species that may be killed as a consequence of hunting in a national park.

Further, the ESA specifically requires that "each agency shall use the best scientific and commercial data available" in implementing the section 7 consultation process, 16 U.S.C. § 1536(a)(2), and the Supreme Court has held that the "obvious purpose" of this standard is to "ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997).   Pulling a "take" number out of thin air without any

accompanying explanation in the decision document as to the specific methodology by which it was derived – especially when the same agency said just five years earlier that only one grizzly bear would be killed by hunter-caused mortality in the Park – appears to be precisely the kind of "speculation or surmise" to which the Supreme Court was referring.[16]

Second, while the Addendum addresses one form of "take" – grizzly bear "mortality" resulting from hunter conflicts – it does *not* address another form of take that the "best available" science reflects is indisputably associated with the hunts: the "harassment" of bears attracted to "gut piles" left behind by hunters.   Thus, the Addendum acknowledges that grizzly bears "seek[] out gut piles left on the landscape during the ERP on Park lands," AR 7003, and, as noted previously, the record is replete with evidence that these gut piles – which exist *only* because of the NPS-authorized hunt – have an enormous effect on grizzly bears' natural feeding behavior in the Park.[17]

---

[16] Indeed, if, as the FWS and NPS represented in 2007, the agencies were committed to phasing out the supplemental feeding program that has been used as a justification for hunting in the Park, then the risk of grizzly bears being killed as a result of hunter conflicts should *decline* over time, rather than exponentially *increase*, as determined by the Addendum.   *See* AR 2309 (2007 EIS) ("In Grand Teton National Park the potential risk of deputized elk hunters killing grizzly bears would be *less* compared to baseline conditions . . . because there would be fewer elk in the park and the *elk reduction program would likely be changed as a result*.") (emphasis added).

[17] *See, e.g.,* AR 3250 (NPS "Special Note – 2008") ("Research shows that grizzly bears seek out gut piles during the hunting season."); AR 4127 (2010 Incident Report of grizzly bear approaching gut pile and forcing hunter to shoot into the air); AR 4663 (2011 Incident Report of a grizzly bear "looking for a gut pile"); AR 4695 (2011 incident report of "haz[ing] grizzly bears off 'gut pile'"); AR 4697 (2011 incident report of grizzly "eating gut pile"); AR 4709 (2011 report that grizzlies "found an elk gut pile"); AR 5238 (2012 incident report) ("Hunter had harvested an elk . . . when he returned to take out his elk he observed 4-5 bears eating it."); AR 7345 (11/25/14 article stating that "grizzly bears have become dependent on the gut piles for food before going into hibernation . . . That means that the cubs growing up will not know another way to get their food and could starve – even now in hunting season the bears don't bother to hunt for themselves."); AR 5127 (9/2/11 e-mail) (describing how "[g]rizzly mom 399 taught her prior three cubs (including her daughter and now grizzly mom 610) to follow the park elk hunters down the Snake River drainage feasting on abandoned gut piles").

In turn, this alteration in natural feeding behavior poses myriad risks to the bears themselves.   *See* AR 6431 (2007 BiOp) ("Food-conditioned bears often must be eliminated or removed from developed areas. . . ."); AR 6441 (2007 BiOp) ("Bears that are typically wary of humans will often tolerate people at close distances when carcasses or other high quality foods are available."); AR 7462 (Journal for Wildlife Management) ("Ungulate harvest and wounding loss by hunters may influence the fall distribution of grizzly bears by creating dispersed 'ecocenters' . . . Bears learn to use available food resources quickly, and when food availability becomes predictable, bears establish traditional use and impart their behavior to their offspring.").

Habituating grizzly bears to hunter-caused "gut piles" is a quintessential example of take through "harass[ment]," 16 U.S.C. § 1532(19), which the ESA specifically prohibits without authorization from the FWS, *id*. § (a)(1)(B); *see also TVA v. Hill*, 437 U.S. 153, 184-85 (1978) ("All persons, including federal agencies, are specifically instructed not to 'take' endangered species, meaning that no one is to *harass* . . . such life forms.") (emphasis added) (internal quotation marks omitted).    The ESA implementing regulations define "harassment" to include any "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly *disrupt normal behavioral patterns, [including]* . . . *feeding*."   50 C.F.R. § 17.3 (emphasis added); *see also Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 704-05 (1995) (explaining that the House Report accompanying the ESA "stated that the 'broadest possible terms' were used to define restrictions on takings," and "underscored the breadth of the 'take' definition by noting that it included

'harassment, *whether intentional or not*'") (emphasis in original) (quoting H. Rep. No. 93-412, at 15 (1973)).

Accordingly, by omitting any analysis of whether the habituation of grizzly bears to "gut piles" constitutes a "take" through harassment – and, if so, what specific "reasonable and prudent measures" are "necessary or appropriate to minimize" the impact of that take, 16 U.S.C. § 1536(b)(4)(C)(ii) – the FWS's Addendum disregards the "best available" science and is otherwise arbitrary and capricious.   *See State Farm*, 463 U.S. at 43 (an agency decision is arbitrary and capricious if it has "entirely failed to consider an important aspect of the problem"); *see also Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) (the best available science standard "prohibits the [FWS] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on").   In addition, especially because NPS is acutely aware that its annual authorizations of the elk hunts are modifying grizzly bear behavior in ways that are unaddressed in the FWS's take authorization, NPS's reliance on the deficient Addendum for compliance with the ESA also violates the Act and is arbitrary and capricious.   *See Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir. 1993) ("Consulting with the FWS alone does not satisfy an agency's duty under the [ESA]. . . . [I]ts decision to rely on a FWS biological opinion must not have been arbitrary or capricious.").

**IV.    AS WITH ITS PRIOR ANNUAL DECISIONS AUTHORIZING ELK HUNTING, NPS'S 2015 DECISION DOES NOT EXPLAIN WHY THE HUNTING IS "NECESSARY FOR THE PURPOSE OF PROPER MANAGEMENT AND PROTECTION OF THE ELK" WITHIN THE MEANING OF 16 U.S.C. § 673c(a).**

As the Supreme Court recently reaffirmed, "[f]ederal administrative agencies are required to engage in reasoned decisionmaking."   *Michigan v. EPA*, 135 S. Ct. 2699, ___, 2015 WL 2473453, at *6 (June 29, 2015) (internal quotation omitted).   Thus, "'not only must an

agency's decreed result be within the scope of its lawful authority, but the process by which

it reaches that result must be logical and rational,'" and "is lawful only if it rests 'on a

consideration of the relevant factors.'"   *Id*. (quoting *State Farm*, 463 U.S. at 43).

NPS's decision authorizing the 2015 elk hunt in Grand Teton – as with the agency's past

decisions, which take a virtually identical form, *see supra* at 17-18 (citing to the agency's hunt

decisions since 2007) – cannot survive such scrutiny.   To begin with, although NPS

may only authorize hunting in Grand Teton in any particular year when the elk hunt is in fact

"found necessary for the purpose of proper management and protection of the elk" themselves,

16 U.S.C. § 673c(a), NPS's 2015 decision document does not explain the basis for that finding.

Rather, it merely states a *conclusion*, asserting that:

> [b]ased on the joint review of the *current* status of the Jackson elk herd (including
> estimated herd size, composition, and ratios; migratory patterns; the number of elk on
> supplemental feed on the [Elk Refuge]; and other technical information), a controlled
> reduction of elk in [Grand Teton] is necessary for the proper management and protection
> of the elk.

AR 7501.   However, there is no accompanying explanation of *how* these factors support the

need for a hunt within the Park or, for that matter, any factual basis for a finding that a hunt of

the specific size, location, and other elements approved by NPS is indeed "necessary" for the

elks' "proper management and protection."   That cannot suffice under Supreme Court and D.C.

Circuit standards for APA review.   *See, e.g.*, *Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1132-

33 (D.C. Cir. 2007) (under the arbitrary and capricious standard, courts "require more than a

result; [courts] need the agency's reasoning for that result"); *Williams Gas Processing-Gulf

Coast Co. v. FERC*, 475 F.3d 319, 329 (D.C. Cir. 2006) ("It will not do for a court to be

compelled to guess at the theory underlying the agency's action; nor can a court be expected to

40

chisel that which must be precise from what the agency has left vague and indecisive.") (citation omitted); *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 437 F.3d 75, 83 (D.C. Cir. 2006) (agency action predicated on "unsupported assertions or unstated inferences" cannot survive arbitrary and capricious review).

Although the Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *State Farm*, 463 U.S. at 43 (citation omitted), there is little discernible about NPS's "path" here other than the fact that it invariably leads to a hunt irrespective of conditions on the ground.   For example, for many years, NPS has declared that it is managing elk in Grand Teton in order to help WGFD meets the state agency's "objective of about 11,000 elk" for the overall herd, AR 2624, and, in turn, approximately 1600 elk summering in Grand Teton.   AR 7535.

Even assuming that WGFD's population objective had any scientific basis in the record – which, as discussed below, it does not – that objective is now being met.   *See* AR 7535 (May 2015 NPS Briefing Statement) ("In early 2015 the Jackson elk herd *was estimated to be at the WGFD herd objective of 11,000 animals*. The [Grand Teton] elk herd segment is near its objective of 1600.") (emphasis added); *see also* AR 7282 ("total numbers of elk in the park are likely at or below 1600").   Because the hunt was previously justified on the ground that it was necessary to accomplish WGFD's "desired population limits," AR 5168 (1/31/11 letter from Grand Teton Superintendent), NPS must at least convincingly explain why the accomplishment of that objective does not now negate any genuine "need" for a hunt in a national park.   *See State Farm*, 463 U.S. at 43 (an agency decision is "arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency").

Moreover, to the extent that NPS claims that the hunt is somehow justified by a continuing need to accomplish WGFD's population objective, there is nothing in NPS's copious record that provides even a scintilla of biological – or any other – support for the 11,000 elk population target.   Indeed, according to a former FWS elk biologist who spent twenty-two years at the Elk Refuge, the 11,000 population target that has guided elk management for many years – as well as NPS's hunting decisions in particular – is a "contrived" number with no scientific foundation whatsoever.   *See* AR 7554 at n. 2 ("'[T]he state's management objective of eleven thousand wintering elk for the Jackson herd is a contrived number . . . [not] rooted in sustainable resource management principles[] or ambient habitat or disease conditions on the ground.") (quoting Bruce Smith, *Where Elk Roam* 206 (2011)).

NPS is statutorily precluded from allowing an elk hunt in a national park *unless* the hunt is genuinely "necessary for the purpose of proper management and protection of the elk" who rely on the Park for habitat.   16 U.S.C. § 673c(a).   NPS cannot satisfy that standard by simply deferring to WGFD's preferred population objective, especially where there is no evidence that NPS has *ever* independently verified that this objective appropriately establishes the parameters for "proper management and protection of the elk" in the Park.   *See Gerber v. Norton*, 294 F.3d 173, 184-86 (D.C. Cir. 2002) (holding that the FWS violated its obligations under the ESA when it uncritically deferred to another entity's assessment of a measure for minimizing impacts on a endangered species).[18]

---

[18] It is particularly problematic for NPS to uncritically defer to WGFD's population objective because NPS and WGFD have very different management mandates.   While NPS's overarching mandate is to preserve Park resources, WGFD's own sister state agency – the Wyoming Department of Agriculture – has pointed out that WGFD "receives a substantial amount of money from elk hunters" through issuance of hunting licenses, and thus inevitably is motivated to facilitate expansive hunting.   AR 2606.   In turn, deferring to WGFD's objectives in

**V.    NPS'S 2015 DECISION, AS WITH ITS PRIOR DECISIONS AUTHORIZING
ANNUAL ELK HUNTS, DOES NOT COMPLY WITH NPS'S OBLIGATION
UNDER THE ORGANIC ACT TO MAKE DETERMINATIONS AS TO
WHETHER THE HUNTS IMPAIR PARK RESOURCES.**

As discussed previously, to ensure that it is fulfilling its obligations under the Park

Service Organic Act "to conserve . . . the wild life" within national parks, and "to provide for the

enjoyment of the same in such manner and by such means as will leave them unimpaired for the

enjoyment of future generations," 16 U.S.C. § 1, NPS's own Management Policies require the

agency to make explicit "non-impairment" decisions concerning any agency actions that may

impair Park resources.   *See supra* at 2-3.   Indeed, the Policies stress in the strongest terms that

it is the "Secretary of the Interior's absolute duty, which is not to be compromised, to take

whatever actions may be necessary to ensure that park resources are not impaired."   AR 1960

(2007 Plan) (citing 2006 Management Policies, § 1.4.2).

Accordingly, "[b]efore approving a proposed action that could lead to an impairment of

park resources and values, an NPS decisionmaker *must* consider the impacts of the proposed

action and *determine, in writing, that the activity will not lead to an impairment of park

resources and values*."   Management Policies § 1.4.7 (emphasis added).   Further, "[w]hen an

NPS decision-maker becomes aware that an ongoing activity *might* have led or *might* be leading

to an impairment of park resources or values, he or she *must* investigate and determine if there is

---

authorizing the hunt unavoidably means that NPS is, in effect, allowing recreational hunting
interests to play an essential role in these annual decisions – although that is *not* one of the
factors that Congress set forth in the statute circumscribing the conditions for the hunt.   *See
State Farm*, 463 U.S. at 43 (an action is arbitrary and capricious if "the agency has relied on
factors which Congress has not intended it to consider"); *see also* AR 7344 (article written by
Park visitor) ("Begging an answer to the question, if this hunt is about elk management and has
nothing to do with man's heritage and a right to hunt elk in a national park, why does the hunt
continue" when WGFD's population target is being met?).

or will be an impairment."   *Id*. (emphasis added).   Impacts constituting such an impairment are

those that, inter alia, would "be inconsistent with a park's purposes or values," create an "unsafe

or unhealthful environment for visitors," "diminish opportunities for current or future

generations to enjoy, learn about, or be inspired by park resources or values," or "unreasonably

interfere with . . . the atmosphere of peaceful tranquility, or the natural soundscape maintained in

wilderness and natural . . . locations within the park."   *Id*. § 1.4.7.1.

 NPS itself has recently opined about the conflicts that the annual hunts are increasingly

creating with other Park values and resources.   As recently as May of this year, NPS declared

that "[r]ecent hunter-grizzly bear conflicts in the park have *highlighted the effects of the program*

*on other park resources and values, including the protection of grizzly bears*," AR 7535 (May

2015 NPS Briefing Statement) (emphasis added).   NPS has also stated point-blank that the hunt

"*conflicts with other park management goals including visitor enjoyment and opportunities for*

*wildlife viewing*," AR 5909 (November 2012 NPS "Briefing Statement") (emphasis added).

These are precisely the kinds of impacts and issues that NPS is required to address in making a

written impairment/non-impairment determination, but the record reflects no such determination

being made for the 2015 hunt, nor for any of the other specific years in which NPS found that an

elk hunt was "necessary."   This is a patent violation of the Organic Act and NPS's interpretation

of it.   *See, e.g.*, *Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 38 (D.D.C. 2010) (finding that

NPS's "impairment analysis" was "profoundly flawed" when the agency relied on a "conclusory

analysis" that was "not based on reasoned explanations" regarding the impact of personal

watercraft); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 103 (D.D.C. 2006) (declining to defer

to NPS's "conclusory or unsupported assertions" regarding the extent to which certain drilling

operations would "result in impairment of park resources and values"); *Greater Yellowstone Coal. v. U.S. Dep't of the Interior*, 577 F. Supp. 2d 183, 195 (D.D.C. 2008) (finding arbitrary and capricious NPS's finding that a winter use plan for several parks would not impair wildlife or other resources).

## VI.    <u>CONCLUSION AND PROPOSED REMEDY</u>

In view of the foregoing legal violations, Defendants' actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "without observance of procedure required by law."   5 U.S.C. § 706(2).   Although there is a more than sufficient legal and factual basis for the Court immediately to enjoin elk hunting in the Park, Plaintiffs are *not* seeking that relief at this juncture.   Rather, in the belief that that full compliance with NEPA, the ESA, and the other conservation statutes at issue *should*, as Congress intended, enhance Defendants' *own* consideration (as informed by appropriate public participation) of the adverse effects of and reasonable alternatives to the anomalous practice of hunting in a national park, Plaintiffs are requesting far more modest relief.   In particular, Plaintiffs respectfully request that the Court issue appropriate declaratory relief and that the Court order Defendants to bring themselves into compliance with their various legal obligations.   The accompanying Proposed Order sets forth Plaintiffs' specific proposal for how the Court should craft such relief.

Respectfully submitted,

/s/Eric R. Glitzenstein
Eric R. Glitzenstein
D.C. Bar No. 358287
Katherine A. Meyer
D.C. Bar No. 244301
Meyer Glitzenstein & Eubanks LLP
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.   20009
(202) 588-5206

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that, on this 21st day of July, 2015, I have caused the foregoing motion

for summary judgment and supporting papers to be filed on all counsel of record, through filing

on the Court's electronic records filing system.

/s/Eric R. Glitzenstein
Eric R. Glitzenstein