# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| TIMOTHY MAYO, *et al.* | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 14-1751 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 65, 66 |
| | : | | |
| JONATHAN B. JARVIS, *et al.*, | : | | |
| | : | | |
| Defendants, | : | | |
| | : | | |
| STATE OF WYOMING, | : | | |
| SAFARI CLUB INTERNATIONAL, | : | | |
| | : | | |
| Intervenor-Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANTS' MOTION TO ALTER OR AMEND THE JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION

## I. INTRODUCTION

Plaintiffs in this case challenged several actions of the National Park Service ("NPS")

and the Fish and Wildlife Service ("FWS") related to the management and conservation of the

elk herd and grizzly bear population in the Grand Teton National Park ("the Park"). In a prior

Memorandum Opinion, the Court granted in part and denied in part Plaintiffs' motion for

summary judgment, rejecting Plaintiffs' claims that the agencies' actions had violated the

National Environmental Policy Act, the Grand Teton National Park Enabling Act, the National

Parks Organic Act, and the Endangered Species Act. *See Mayo v. Jarvis*, --- F. Supp. 3d ----,

Nos. 14-1751 & 15-0479, 2016 WL 1254213, at *8–39 (D.D.C. Mar. 29, 2016). The Court did

grant summary judgment in Plaintiffs' favor on one claim made by the plaintiffs in a related

case, which the Court construed Plaintiffs to have incorporated by reference. *Id.* at *31 n.38.

Now before the Court are Defendants' and Plaintiffs' respective motions to alter or amend the judgment, or for reconsideration, under Federal Rule of Civil Procedure 59(e). As explained below, the Court will grant Defendants' motion and deny Plaintiffs' motion.

## II.  FACTUAL BACKGROUND

As the Court's prior opinion explained in detail, this case involves two iconic species—the elk and the grizzly bear—and their habitat in the Park. *See Mayo*, 2016 WL 1254213, at *1–6. When Congress created the Park, it provided that conservation of the elk should include a "controlled reduction" when necessary "for the purpose of proper management and protection of the elk." 16 U.S.C. § 673c(a). The NPS and Wyoming's Governor have annually approved a harvest of elk from the Park, and in 2007 the NPS issued a joint plan with the FWS (which manages the abutting National Elk Refuge) for the management of the bison and elk herds that migrate across the Park, the Refuge, and nearby federal, state, and private lands. That plan called for continuing the elk reduction program, through an annual hunt.

Because the plan was anticipated to have certain effects on the grizzly bear, a species listed as threatened under the Endangered Species Act ("ESA"), the NPS consulted with the FWS concerning those effects. After a species is listed as endangered or threatened, Section 7 of the ESA requires every federal agency, in consultation with the Secretary of the Interior, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). As part of its formal consultation, the FWS issues what is called a "biological opinion" (or "BiOp") which explains whether the Service believes that the action will jeopardize the continued existence of the species. *See* 50 C.F.R. § 402.14(g)(4). The BiOp must "detail[] how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A); *see*

*also* 50 C.F.R. § 402.14(h)(2).  If the FWS concludes that the action is unlikely to jeopardize the continued existence of the species, but is nonetheless likely to result in some "'incidental take'" of the species, "the BiOp must set forth an Incidental Take Statement, which specifies the permissible amount or extent of this impact on the species."  *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 237 (D.D.C. 2015) (internal quotation marks omitted); *see also* 16 U.S.C. § 1536(b)(4)(B); 50 C.F.R. § 402.14(i)(1).  To "take" an animal is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  ESA's implementing regulations further define "harass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  50 C.F.R. § 17.3.

The FWS issued a BiOp in 2007 concluding that the elk and bison management plan would not jeopardize the continued existence of the grizzly bear, and anticipating that one bear would be lethally "taken" in the Park during the fifteen-year implementation of the plan.  *See* FWS-1691.  The BiOp did not mention any other type of take that was anticipated to result from the plan.  In 2013, after hunters killed a grizzly bear in the Park, the NPS reinitiated consultation with the FWS, and the FWS issued an addendum to the BiOp increasing the total anticipated incidental take in the Park to five bears.  *See* FWS-1664.  The addendum otherwise reiterated that the 2007 BiOp had "described all proposed actions and potential effects to the listed species."  *See* FWS-1662.

Among other reasons, Plaintiffs argued that the FWS violated the ESA because the 2007 BiOp and 2013 Addendum failed to address whether the habituation of grizzly bears to hunter-caused elk viscera piles—which constitute a ready food source for the bears but which Plaintiffs

claim disrupt the grizzly bears' natural feeding habits—qualified as "take" through harassment. The Court rejected this contention. *See Mayo*, 2016 WL 1254213, at *36–37. The Court noted that the 2007 BiOp had expressly acknowledged that grizzly bears sought out elk gut piles left on the landscape during the annual elk hunt and had explained that such carcasses "are an especially important food source for bears in the spring and fall." *Id.* at *36 (quoting FWS-1672). The Court also pointed out that other studies and reports, which the 2007 BiOp cited, contained numerous references to the fact that animal carcasses formed an important part of the grizzly bear's diet. *Id.* The Court concluded that "[t]he agency's silence in the face of this evidence implies that it did not consider these activities to rise to the level of 'harassment,' as that term is used in the taking context." *Id.*

The Court went on to explain that "even if the 2007 BiOp and the 2013 Addendum left the agency's conclusion implicit, the agency's response to a letter [Plaintiffs] submitted indicating [their] intent to sue for violations of the ESA made the connection explicit." *Id.* at *37. The Court rejected Plaintiffs' claim that the letter constituted a *post hoc* rationalization. *Id.* In that letter, the NPS and the FWS asserted that the agencies "disagree that the seeking out of gut piles by grizzly bears is 'take' in the form of harassment" because, among other things, "[g]ut piles/remains from hunter-killed elk and bison . . . differ little from gut piles/remains from natural predation (such as by cougars or wolves) or death, except that they are the result of human versus natural processes." NPS-6861. The Court found that the response, "which sets forth the agency's own rationale for its conclusion, cannot be characterized as a *post hoc* rationalization." *Mayo*, 2016 WL 1254213, at *37. In addition, the Court found that the record evidence Plaintiffs claimed supported their argument that attraction to the gut piles constituted take either aligned with "the agency's determination that feeding on gut piles is not unusual or

disruptive to the grizzly bear" or consisted of "anecdotal, unsupported evidence from laypeople" that was not the sort of "'best scientific and commercial data available' that the FWS and NPS are required to rely on when consulting on the ESA." *Id.* (quoting 16 U.S.C. § 1536).

The Court did grant summary judgment in plaintiffs' favor on one claim—made by the plaintiffs in a related case, *Sierra Club v. Jewell*, No. 15-0479—which alleged that the FWS violated the ESA by failing to consider the impact of other incidental take of grizzly bears that had been authorized in the Greater Yellowstone Ecosystem when it analyzed the effects of the elk hunt on the grizzly bear population. *Id.* at *31–35. The Court construed Plaintiffs in this case to have incorporated that argument by reference. *Id.* at *31 n.38.

Plaintiffs have now moved for reconsideration of the Court's harassment determination, arguing that the Court should not have considered the joint agency letter and that, without the letter, the Court could not properly conclude that the FWS adequately considered the harassment issue.[1] *See generally* Pls.' Mot. for Partial Recon. ("Pls.' Mot."), ECF No. 66. Separately, Defendants move to alter or amend the judgment on the ground that the Court erroneously concluded that Plaintiffs here raised the one prevailing claim made by the plaintiffs in *Sierra Club v. Jewell*. *See generally* Defs.' Mot. to Alter or Amend J. ("Defs.' Mot."), ECF No. 65.

## III.  ANALYSIS

Both parties move to alter or amend the judgment, or for reconsideration, under Federal Rule of Civil Procedure 59(e). Granting a Rule 59(e) motion "'is discretionary' and need not be granted unless the district court finds that there is an 'intervening change of controlling law, the

---

[1] Intervenor the State of Wyoming has filed a notice joining Defendants' opposition, and Intervenor Safari Club International has filed its own opposition adopting Defendants' opposition and raising additional arguments. *See* State of Wyo. Resp. to Pls.' Mot., ECF No. 69; Safari Club Int'l's Opp'n to Pls.' Mot. Part. Recon. ("Safari Club Opp'n"), ECF No. 70.

availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"
*Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (quoting *Nat'l Trust v. Dep't of State*, 834 F. Supp. 453, 455 (D.D.C. 1993)).

### A. Plaintiffs' Motion for Partial Reconsideration

In their motion, Plaintiffs contend that the Court "does not appear to have found the FWS's 'silence' in the Addendum a sufficient basis alone for holding that the FWS adequately considered the harassment issue," Pl.'s Mot. at 3, and argue that the Court's reliance on the FWS and NPS post-decision letter was clear error for various reasons, *id.* at 3–10. Plaintiffs misread the Court's decision, however. The FWS's 2007 BiOp and 2013 Addendum, on their own terms, indicate that the FWS did not believe that the presence of hunter-created elk guts in the Park constitutes harassment under the ESA. That conclusion holds true even without considering the post-decision letter. The FWS's "reasonably . . . discern[able]" conclusion suffices to defeat Plaintiffs' arbitrary and capricious challenge. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

As the Court's Memorandum Opinion already explained, the 2007 BiOp explicitly discussed the availability of elk viscera as a grizzly bear food source. *Mayo*, 2016 WL 1254213, at *36. For example, the BiOp explained that grizzly bears in the Yellowstone Ecosystem "have the highest percentage of meat consumption in their diet of any inland grizzly bear population." FWS-1672. The BiOp also explained that ungulates "are an especially important food source for bears in the spring and fall" and that the "use of these carcasses" is "well documented." FWS-1672. It described carcasses as among the "high quality foods" available to the bears. FWS-1682 ("Bears that are typically wary of humans will often tolerate people at close distances when carcasses or other high quality foods are available."). Indeed, in the section entitled "Effects of

the Action," the BiOp stated that the "[t]raditional early fall elk hunts" in nearby Bridger-Teton National Forest, which take place in the fall like the Park hunt, "have created a reliable food source for hyperphagous bears which take advantage of ungulate remains left by hunters."[2] FWS-1687.  Moreover, the 2013 Addendum stated that the 2007 BiOp had described all proposed actions and potential effects to the listed species, and also reiterated that grizzly bears "seek[] out gut piles left on the landscape during the ERP [Elk Reduction Program] on Park lands."  FWS-1662.  Finally, as the Court noted in its opinion, "the remainder of the record which was before the agency and, in most instances, cited in some regard in the BiOp and Amended BiOp, contains numerous references to animal carcasses as part of the grizzly bear's diet."  *Mayo*, 2016 WL 1254213, at *36.

A BiOp must include both a "summary of the information on which the opinion is based" as well as a "detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R. § 402.14(h)(1)–(2).  The BiOp's references to both the increased availability of elk viscera and those elk guts' use as a high quality food source demonstrate that the FWS considered the elk hunt's effects on the grizzly bear, generally, and the effect of gut piles left by hunters, specifically.  In addition where, as here, the FWS concludes that the action is not likely to jeopardize the continued existence of the listed species, the BiOp must also formulate "a statement concerning incidental take" and specify "the amount or extent[] of such incidental taking on the species."  50 C.F.R. § 402.14(g)(7), (i)(1)(i).  In its BiOp, the FWS noted that harassment is a form of take, and set forth the definition of that term.  *See* FWS-1690.

---

[2] To be sure, the 2013 Addendum noted that the final elk and bison management plan and accompanying Environmental Impact Statement only covered the Park and Elk Refuge, and excluded discussion of the Bridger-Teton National Forest.  *See* FWS-1662.  But this reference still makes clear that the FWS was aware of the existence of elk viscera left behind by hunters.

Nevertheless, despite acknowledging the fact that harassment can constitute take, the BiOp limited its take statement to the lethal taking of grizzly bears.  *See* FWS-1690–91.

Taken together, the BiOp thus establishes two things: (1) that the agency considered the effect of hunter created elk viscera and found it to be, if anything, a neutral to positive one for the grizzly bear; and (2) that the agency acknowledged the possibility that harassment of a species "by annoying it to such an extent as to significantly disrupt normal behavior patterns," including "feeding," could constitute take.  FWS-1690.  To be sure, the agency did not go on to explicitly state outright that it did not find the existence of hunter-caused elk viscera to constitute harassment.  But the inference that reasonably can be discerned from the fact that the 2007 BiOp acknowledged both that harassment is a possible type of take and that hunter-caused elk viscera results from the elk hunt (a result noted in neutral to positive terms) is that the FWS did not consider the elk viscera to significantly disrupt grizzly bears' feeding patterns.  As the Court previously explained, the BiOp "implies that [the FWS] did not consider these activities to rise to the level of 'harassment,' as that term is used in the taking context."  *Mayo*, 2016 WL 1254213, at *36.

In arguing to the contrary, Plaintiffs rely on a series of cases standing for the proposition that silence, alone, does not suffice to sustain an agency's action.  In this vein, the Court recognizes some tension between two administrative law principles that might be read at odds with one another.  On the one hand, it is a basic principle of administrative law that a court "can only look to [the agency's] stated rationale," and will not "sustain its action on some other basis [the agency] did not mention."  *Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006).  Where "a statute requires an agency to make a finding as a prerequisite to action, it must do so," *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002), and a court "will not transform" an

agency's "silence into an expression of its expertise," *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 241 (D.D.C. 2011).  A Court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  *Bowman Transp., Inc.*, 419 U.S. at 286.

On the other hand, however, a court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* at 286.  If "the necessary articulation of [the] basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, [the court] will make the reference."  *Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986) (internal quotation mark omitted) (quoting *Envt'l Def. Fund, Inc. v. EPA*, 465 F.2d 528, 537 (D.C. Cir. 1972)).  Courts "do not demand sterile formality." *Envt'l Def. Fund*, 465 F.2d at 537.

In this case, and unlike in *Gerber*, for example, the FWS was not silent on *either* of the necessary considerations it is required to make.  The FWS specifically discussed both the effects of the action, and anticipated incidental take.  And it also recognized that the prevalence of hunter-created elk gut piles is one consequence of the Park elk hunt.  Therefore, what the Court previously, and inartfully, described as "silence" is more accurately described as a failure to explicitly link the BiOp's discussion of elk viscera to the agency's take conclusion.  But the agency's discussion of both considerations make obvious why the FWS does not consider that activity to constitute harassment.  For that reason, this case falls into the latter category of agency explanations, where an agency's path "may reasonably be discerned."  *Bowman Transp., Inc.*, 419 U.S. at 286.  This is a case in which the "necessary articulation of [the] basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons."  *Miller*, 801 F.2d at 497.

Perhaps this implicit reasoning skirts close to the line.[3]  And the Court would be confronted with a different question if evidence in the record indicated that the FWS failed to address an apparent effect of the action altogether, or if record evidence suggested that an effect discussed in the BiOp in fact posed a more problematic or different threat to the species than the agency described.  But, here, as the Court already explained in its prior opinion, the evidence Plaintiffs cite to support their claim that hunter-produced gut piles have negative effects either "aligns with" the agency's determination that feeding on gut piles—even those incidentally created by hunting—"is not unusual or disruptive to the grizzly bear," or consists of purely anecdotal layperson evidence which does not consist of the sort of "'best scientific and commercial data'" upon which the agency must rely.  *Mayo*, 2016 WL 1254213, at *37 (quoting 16 U.S.C. § 1536).  Because the Court can reasonably discern the agency's reasoning on the basis of the 2007 BiOp and 2013 Addendum, alone, summary judgment was properly granted in Defendants' favor.

The Court emphasizes that it no longer relies on the post-decision letter.  Despite the Defendants' assertion that the Court has discretion to consider that letter as part of the "whole record" or as extra-record information, the Court declines to do so.  *See* Defs.' Opp'n to Pls.' Mot. Recon. at 7–8, ECF No. 68.  When it rendered its prior decision, the Court was unaware that Defendants had affirmatively agreed to remove the identical letter from the FWS certified

---

[3] Or maybe not.  In the Court's view, requiring the FWS to either redundantly list each effect of the action that the FWS believes does not rise to the level of take, or to anticipate any and all effects that a putative plaintiff might later argue constitutes take, would place an onerous burden on the agency.  As Intervenor Safari Club International argues, many "minor activities do not rise to the level of take."  *See* Safari Club Opp'n at 3.  "Hunters, bikers, campers, photographers, and other Park users all impact bear behavior slightly by causing noise or introducing human scent."  *Id.*  Yet, at least where there is nothing in the record to indicate otherwise, it borders on the formalistic to require the FWS to explicitly state that all such minor impacts do not constitute harassment or other forms of take.

Administrative Record (although it remained in the NPS-bates stamped portion of the record), after Plaintiff noted that the letter post-dated the FWS's promulgation of the BiOp Addendum. *See* Pls.' Mot. at 4 (describing this history); *see also* Pls.' Mot. Ex. A (Plaintiffs' letter noting that the letter was a "post-Addendum document"); Pls.' Mot. Ex. B (Defendants' response, stating that "[t]he Service will remove from the Record the response letter"). The Court's analysis above renders consideration of the letter unnecessary. As a result, the Court need not resolve Plaintiffs' argument that Defendants waived any reliance on the letter by failing to include it in the FWS-specific record or to cite to it in their summary judgment memoranda.[4] *See* Pls.' Mot. at 3–4.

Nevertheless, in the event the issue arises in the D.C. Circuit on appeal, the Court notes that it continues to believe that the letter does not constitute an improper *post hoc* rationalization. The *post hoc* rationalization rule prohibits a court from upholding an agency's decision based on "rationalizations offered for the first time in litigation affidavits and arguments of counsel." *Local 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976) (citations omitted). But it does not bar an agency from "further articulat[ing] . . . its reasoning," *id.*, although any new articulation must be "merely explanatory of the original record and should contain no new rationalizations," *Envt'l Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981).

While Plaintiffs argue that the *post hoc* rationalization rule's application is limited solely to explanations an agency provides on remand, *see* Pls.' Mot. at 8; Pls.' Reply at 5–6, the D.C.

---

[4] On March 22, 2016, the Court ordered the parties to supplement the Joint Appendix with the letter, which they had identified in the Certified Administrative Record Indexes. *See* Mar. 22, 2016 Minute Order. The Court did so because a pre-litigation letter Plaintiffs sent to the NPS, which was included in the Joint Appendix, referenced that letter and described the agencies' further articulation of the FWS's harassment determination. *See* NPS-7552.

Circuit has never construed the rule so narrowly.  Consider *Population Institute v. McPherson*, in which the Circuit reviewed the Administrator of the United States Agency for International Development's decision to withhold earmarked funds for the United Nations Fund for Population Activities ("UNFPA").  *See* 797 F.2d 1062, 1064 (D.C. Cir. 1986).  The Administrator had concluded that releasing those funds would violate a statutory provision prohibiting funding for any organization that supports or participates in a program of coercive abortion or involuntary sterilization.  *See id.*  After the district court rejected a putative grantee's challenge to the Administrator's decision, the D.C. Circuit granted the plaintiffs' motion for an injunction pending appeal.  *Id.* at 1067.  The Circuit concluded that an injunction was warranted because the Administrator seemed to have erroneously premised his decision on an interpretation that the statute left him with no alternative but to withhold the funds, and had based his interpretation of Congress's intent on the view of "a single member of Congress."  *Id.*

Before the D.C. Circuit heard the case on the merits, however, "the Administrator issued a statement affirming his earlier decision to withhold funds from UNFPA but examining the statute with greater detail and in light of [the Circuit's] decision granting the injunction."  *Id.* at 1068.  Even though the case had not been remanded or otherwise returned to the agency, the Circuit rejected the plaintiffs' claim that the Administrator's renewed statement—issued while litigation was ongoing—was an impermissible *post hoc* rationalization.  The Court emphasized that the Circuit was "not confronted by a hypothetical explanation by appellate counsel of why an agency might have done something," but with the explanation of the "*decisionmaker himself*," who had "reconsidered the matter and arrived at the same result but expanded on his rationale."  *Id.* at 1072 (emphasis added).  Indeed, the D.C. Circuit emphasized that the Administrator's second determination "was made while litigation challenging the propriety of the

12

Administrator's determination was pending" before the Circuit.  *Id.* at 1071.  The same is true of *Appeal of Bolden*, in which the D.C. Circuit considered the Office of Personnel Management's decision to exclude from a health care refund scheme those individuals enrolled in the relevant benefit plan before a particular date.  848 F.2d 201, 202 (D.C. Cir. 1988).  Although the plaintiffs filed their lawsuit in 1985, the Court considered a 1986 OPM decisional memorandum—which the Circuit emphasized was submitted "after the suit had commenced"—because OPM had "previously considered the reasons given in its decisional [m]emorandum," and that document only served "to amplify the administrative record."  *Id.* at 207.

So too, here.  The FWS and the NPS—the relevant decisionmakers themselves— provided a more explicit, robust explanation of why they did not consider elk viscera caused by hunting to constitute harassment.  It would be one thing if the agency *changed* its explanation, or if counsel fashioned an entirely new explanation for purposes of litigation.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 50 (1983); *Costle*, 657 F.2d at 275.  But where the agency decisionmaker merely expounds upon reasoning "obscured *but implicit* in the administrative record," that further articulation is not generally problematic.  *Appeal of Bolden*, 848 F.2d at 207 (emphasis added) (quoting district court opinion).  Here, as explained above, the FWS discussed the existence and effect of hunter-caused elk viscera, and also considered incidental take, including the possibility of take through harassment.  All the post-decision letter did is explicitly expand upon the conclusion that was already implicit in the original BiOp.[5]

---

[5] As a jurisdictional prerequisite, the ESA requires that a plaintiff give the FWS notice 60 days before bringing suit.  *See* 16 U.S.C. § 1540(g)(2). Plaintiffs contend that reliance on an agency's response to a post-decision letter will have "the counterproductive effect of encouraging the parties providing notice to file suit as soon as the period runs in order to avoid having their notice treated as an opportunity for shoring up a decision previously made."  Pls.' Mot. at 8 n.4; *see also* Pls.' Reply at 5.  This fear is unfounded.  Plaintiffs' proposition appears to turn on the assumption that the Court's consideration of the post-decision response letter here

### B.  Defendants' Motion to Alter or Amend the Judgment

Defendants also move to alter or amend the judgment, arguing that the Court erroneously granted partial summary judgment to Plaintiffs on Count IV of their complaint.  *See generally* Defs.' Mot.  The Court granted the *Sierra Club* plaintiffs' motion for summary judgment on the ground that, when it made its "no jeopardy" finding, the FWS failed to consider and evaluate the impact of other incidental take that had been authorized in the GYE since 2007.  *See Mayo*, 2016 WL 1254213, at *31.  The Court granted summary judgment to the plaintiffs in this case on that ground as well, concluding that they had "incorporated Sierra Club's arguments by reference." *Id.* at *31 n.38.  Defendants point out, however, that Plaintiffs expressly *did not* incorporate by reference the portion of the *Sierra Club* plaintiffs' brief that made the specific argument that prevailed.  *See* Defs.' Mot. at 3–4.  *Compare* Mayo Pls.' Mem. Supp. Mot. Summ. J. at 35–36, ECF No. 35 (incorporating by reference only the arguments made on pages 21 through 30 in the *Sierra Club* plaintiffs' memorandum supporting their motion for summary judgment), *with Sierra Club* Pls.' Mem. Supp. Mot. Summ. J. at 14–21, ECF No. 26 (Case No. 15-cv-0479) (making prevailing argument).  Recognizing this error, Plaintiffs do not oppose the request.  *See* Pls.' Resp. to Defs.' Mot. to Alter or Amend the Judgment, ECF No. 67.  Accordingly, the Court finds that amending the judgment is necessary to "correct clear error," and Defendants' motion

---

implies that *any* response from the agency that is issued before a lawsuit is filed could be considered by a court.  That assumption is inaccurate.  The relevant consideration is not *when* the agency issues a more robust explanation, but *what* that explanation says.  If that explanation consists only of a "further articulation of [the agency's] reasoning" it might be considered, depending on the circumstances of the case.  *See Local 814*, 546 F.2d at 992.  Any attempt by the FWS or the NPS to concoct an entirely new justification for the agency's determination, however, would likely be rejected as a *post hoc* rationalization—regardless of whether it was issued before or after the plaintiffs filed suit.  Here, the agencies' joint response simply reiterated, with a more explicit rationale, a conclusion that was already discernable from the 2007 BiOp and 2013 Addendum.

must be granted.  *Piper v. U.S. Dep't of Justice*, 312 F. Supp. 2d 17, 20 (D.D.C. 2004).  In light of the Court's resolution of Plaintiffs' motion for reconsideration, the Court will therefore enter an amended order entering judgment on all counts in Defendants' favor.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion to alter or amend the judgment (ECF No. 65) is **GRANTED** and Plaintiffs' motion for partial reconsideration (ECF No. 66) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 1, 2016                                      RUDOLPH CONTRERAS
                                                            United States District Judge